T.C. Memo. 2012-168

UNITED STATES TAX COURT

STEVEN W. REPETTO AND GAYLE F. REPETTO, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 17204-09, 17242-09,      Filed June 14, 2012.
             17243-09.

<u>David Victor Capes</u> and <u>Sara G. Neill</u>, for petitioners.

<u>Catherine S. Tyson</u>, <u>Steven W. LaBounty</u>, and <u>Peter N. Scharaff</u>, for

respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>: These cases are consolidated for purposes of trial,

briefing, and opinion. One case involves the 2004-06 Federal income taxes and the

[1]Cases of the following petitioners are consolidated herewith: Yolo, Inc.,
docket No. 17242-09; and WFR Investments, Inc., docket No. 17243-09.

2004-06 excise taxes under section 4973[2] of Steven[3] W. and Gayle F. Repetto.  The second case involves the 2005-06 Federal income taxes of Yolo, Inc. (Yolo), a C corporation in which Mrs. Repetto's Roth individual retirement account (IRA) owned a 98% interest.  The third case involves the 2005-06 Federal income taxes of WFR Investments, Inc. (WFR), a C corporation in which Mr. Repetto's Roth IRA owned a 98% interest.

Respondent determined the following deficiencies, additions to tax, and penalties:

### Mr. and Mrs. Repetto, docket No. 17204-09

| | | Additions to tax and penalty | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(a)(2)[1] | Sec. 6662A |
| 2004 | $28,779 | $1,179.23 | to be determined | $9,259.32 |
| 2005 | 83,908 | 2,131.20 | to be determined | 21,855.65 |
| 2006 | 62,339 | 3,645.68 | to be determined | 13,879.43 |

[1]Respondent explains in the notice of deficiency that the additions to tax under sec. 6651(a)(2) will be determined on the basis of the liability shown on the sec. 6020(b) returns or the redetermined liability, if less.

---

[2]Unless otherwise indicated, section references are to the Internal Revenue Code (Code), as amended and in effect for the years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

[3]Some documents in the record show Mr. Repetto's first name as "Stephen".

Yolo, docket No. 17242-09

| Year | Deficiency | Penalty Sec. 6662A |
|------|-----------|--------------------|
| 2005 | $8,811 | $2,640.02 |
| 2006 | 5,347 | 2,691.05 |

WFR, docket No. 17243-09

| Year | Deficiency | Penalty Sec. 6662A |
|------|-----------|--------------------|
| 2005 | $5,396 | $3,777.06 |
| 2006 | 9,903 | 2,666.16 |

After concessions,[4] the issues for decision are: (1) whether Mr. and Mrs. Repetto made excess contributions to their Roth IRAs and are liable for excise taxes under section 4973; (2) whether SGR and WFR may deduct facilities support expenses;[5] (3) whether respondent properly characterized certain payments from SGR to Mr. Repetto as compensation; (4) whether Yolo may deduct medical

---

[4]Petitioners concede the following adjustments to the Form 1120S, U.S. Income Tax Return for an S Corporation, of SGR Investments, Inc. (SGR), which the Repettos wholly owned: rent and occupancy expenses for 2004-05, selling-related expenses for 2004-06, and automobile and local travel expenses for 2006. Petitioners also concede the adjustments to Yolo's selling-related expenses for 2005-06. Petitioners are not conceding the penalties under sec. 6662A on understatements with respect to these items.

[5]SGR claimed deductions for facilities support, and WFR claimed deductions for outside services or facilities staffing and support. For brevity, we shall refer to SGR's and WFR's deductions and expenses as facilities support.

reimbursement expenses and officer compensation expenses; (5) whether the Repettos are liable for the additions to tax under section 6651(a)(1) and (2); and (6) whether petitioners are liable for enhanced accuracy-related penalties under section 6662A.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts is incorporated herein by this reference. The Repettos resided in Missouri when they filed their petition. Yolo and WFR maintained their principal places of business and principal offices in Missouri when they filed their petitions.[6]

### I. The Construction Business

#### A. The Construction Business Before 2003

Mr. Repetto graduated from college with a degree in business administration in 1972. From 1972 until 2002 when Mr. Repetto retired, he worked as a salesperson for IBM. Mrs. Repetto graduated from college with a degree in engineering management in 1984 and was employed during the years at issue.

---

[6]WFR's bylaws stated that its principal office was in Nevada. However, the record establishes that WFR's principal office and principal place of business were in Missouri.

In the early 1990s Mr. Repetto met and became friends with Ray Porschen, Jr. Mr. Porschen was the sole shareholder of Porschen Construction, Inc. (Porschen Construction), which constructed spec homes[7] in the Lake of the Ozarks area in Missouri.

With his retirement nearing, Mr. Repetto sought an additional source of income. In 1999 Mr. Repetto entered into a real estate development business with Porschen Construction. Porschen Construction, Mr. Repetto, and Mrs. Repetto formed Ozark Future, L.L.C. (Ozark Future), a limited liability company classified as a partnership for Federal income tax purposes. Porschen Construction had a 50% interest in Ozark Future, and Mr. and Mrs. Repetto each had a 25% interest. Ozark Future was in the business of purchasing lots and constructing spec homes.

From Ozark Future's formation until approximately 2002 the Repettos' role in it was that of investors; their involvement allowed Ozark Future to obtain more loans. The Repettos signed for Ozark Future's loans and personally guaranteed them. The Repettos continued working full time, but when Mr. Repetto was able to, he worked with Mr. Porschen to learn about home building.

---

[7]A spec home, as opposed to a custom-built home, is a home that a developer builds to his own specifications before he has a contract with a prospective buyer.

During that period (until 2002) Porschen Construction was primarily responsible for general contracting and construction management supervision for Ozark Future.[8] It performed most of the work involved, including formulating plans, acquiring land, and obtaining necessary approvals.

Porschen Construction also hired subcontractors for Ozark Future to build homes on properties Ozark Future had acquired, and it received bids from 50-70 subcontractors.[9] Mr. Porschen's wife, Nancy Porschen, worked out design details, selected and revised plans, and worked with the architect. She also sold the constructed homes through her real estate company. Sometimes Mrs. Repetto accompanied Mrs. Porschen to design centers and open houses, and occasionally Mrs. Repetto picked out design elements for homes.

---

[8]The parties stipulated that Porschen Construction was primarily responsible for general contracting and construction management supervision until the end of 2003. However, on the basis of the record as a whole, we find that Porschen Construction's role in Ozark Future decreased in 2002 with Mr. Porschen's illness.

[9]The parties stipulated that from the time of Ozark Future's formation until late 2003 Mr. Repetto was primarily responsible for performing marketing and design work of Ozark Future, which included marketing, design, and business development. However, Mr. Repetto credibly testified that in the early years of Ozark Future (1999-2001) Porschen Construction did the design work. In the light of Mr. Repetto's testimony, we find that Mr. Repetto became more heavily involved with design and marketing for Ozark Future starting in 2002, rather than after Ozark Future's formation.

At some point before or in 2001 the Repettos' attorney, John Curran,[10] advised them that their involvement in Ozark Future as individuals was putting their personal assets at risk, for example, in case a subcontractor became injured. Mr. Curran also advised them that if they could not sell a home, the lending bank could sue them personally. On September 24, 2001, the Repettos caused SGR to be organized. It elected S corporation status. The Repettos owned 100% of the stock of SGR.[11] In 2002 the Repettos transferred their interests in Ozark Future to SGR.

In July 2002 Mr. Porschen was diagnosed with cancer. Mrs. Porschen drove him to St. Louis, Missouri, for frequent medical appointments. Over time Mr. Porschen's physical condition worsened, and his energy and the amount of time that he could devote to Ozark Future gradually declined. Because Mr. Porschen could not be on jobsites as much as he used to be and because subcontractors required a management presence on the jobsite, Mr. Repetto became more involved in Ozark Future's business in 2002, after he retired from IBM. Mrs. Repetto's involvement in the business also expanded.

---

[10]The record also reflects the spelling of his last name as "Kern".

[11]The 2004-06 Forms 1120S show that Mr. Repetto was SGR's sole shareholder. However, Mr. and Mrs. Repetto testified that they each own and had continuously owned a 50% interest in SGR. The inconsistency in the record does not affect our resolution of the issues in these cases.

As Mr. Porschen's illness progressed, the Repettos considered Ozark Future's prospects. They wanted SGR to take advantage of the real estate market in the Lake of the Ozarks area and in Florida, yet they did not want to abandon their relationship with Ozark Future and the Porschens. As of 2003, they understood that Mr. Porschen was planning to retire.

B.      The New Structure

In 2003 the Porschens introduced the Repettos to Frank Zerjav, a certified public accountant (C.P.A.) in St. Louis, Missouri, who had been the Porschens' accountant for several years. Mr. Zerjav told the Repettos about his accounting firm and stated that he had a lot of experience working with clients in the real estate business. Mr. Zerjav suggested a meeting in his office.

At the first meeting in Mr. Zerjav's office in late summer or early fall of 2003, the Repettos met James Harrell, an attorney and C.P.A. Mr. Harrell received his C.P.A. certificate in 1973, graduated from law school in 1982, and has practiced general business and tax law since 1982. At that meeting Mr. Harrell proposed a structure whereby two new corporations would be incorporated and would be owned in part by Roth IRAs. Messrs. Harrell and Zerjav told the Repettos that such

a structure was preferable from an asset protection standpoint because the corporate assets could not be reached in case of a lawsuit. The Repettos were unfamiliar with such a structure and questioned Mr. Harrell regarding its legitimacy. Mr. Harrell confirmed that as long as rules were followed, it was permissible for a C corporation to be owned in part by a Roth IRA.

Mr. Harrell also explained the difference between a traditional IRA and a Roth IRA. Mr. Harrell explained that the corporations would create profits and pay taxes, that the corporations could pay dividends to shareholders, including the Roth IRAs, and that those amounts could be withdrawn from the Roth IRAs upon retirement tax free. Mr. Harrell and the Repettos understood that the relationship between SGR and Ozark Future would remain unchanged and that the two new corporations would provide services to SGR. Although the Repettos did not have a good understanding of the structure, they retained Mr. Harrell to set it up.

At some point around October 28, 2003, Mr. Harrell sent the Repettos an Engagement and Scope of Services Letter (engagement letter). According to the engagement letter, Mr. Harrell would form two corporations, one to provide office and support services for SGR and the other to provide marketing and business development services for SGR. The engagement letter also stated that "[i]t is our

understanding that you will each establish a Roth IRA with a custodian who will allow" each Roth IRA to become a 98% shareholder of the respective corporation.

Mr. Harrell's services included introducing the Repettos to a Roth IRA custodian and implementing the structure, including coordinating payment of the first dividend to the Roth IRA. The engagement letter provided for a $15,000 fee. Upon receipt of the engagement letter, Mrs. Repetto emailed Mr. Harrell several questions, one of which read: "We do not meet the rules for a ROTH IRA as our Adjusted Gross Income is to [sic] high. I understand that we can pay a fine as you explained but would our IRA be fraudulent?" Mr. Harrell replied "No".

On November 4, 2003, Mr. Harrell incorporated Yolo, a Missouri corporation. Mrs. Repetto became Yolo's sole director and its president, secretary, and treasurer.

On November 7, 2003, Mr. and Mrs. Repetto opened Roth IRAs with a $1,500 contribution to each Roth IRA at First Regional Bank, Trust Administration Services.

On November 18, 2003, Mr. Harrell incorporated WFR, a Nevada corporation. Mr. Repetto became WFR's sole director and its president, secretary, vice president, and treasurer. Yolo's and WFR's business addresses were the same as the Repettos' home address.

The Roth IRA for the benefit of Mrs. Repetto subscribed to 98% of Yolo stock, and Mrs. Porschen subscribed to the remaining 2%.[12] The Roth IRA for the benefit of Mr. Repetto subscribed to 98% of WFR stock, and Mr. Porschen subscribed to the remaining 2%. The stock that the Porschens subscribed to in Yolo and WFR was nonvoting.[13]

In November 2003 SGR and Yolo entered into a 10-year agreement (SGR agreement) according to which Yolo would provide the following services to SGR at SGR's place of business, i.e. the Repettos' home:

> assistance with entering accounting information into the computer accounting application quickbooks; assistance with computer; assistance with printing reports; accessing internet for material research; processing email; soliciting and receiving bid [sic] from potential subcontractors; assistance with marketing communication; assistance with interior selections; assistance with mail processing; basic office support such as answering telephone, returning phone calls, and sending/receiving packages.

The SGR agreement provided that Yolo would be compensated at the rate of $4,800 per month through 2006 and at the rate of $4,000 per month thereafter. On

---

[12]Mrs. Porschen and Mrs. Repetto agreed that if Mrs. Porschen opened a Roth IRA that owned a corporation, Mrs. Repetto would be a 2% shareholder of that corporation. On a date that does not appear in the record, Mrs. Repetto became a 2% shareholder of that corporation.

[13]The copies of the subscription agreements in the record are signed but undated.

December 4, 2003, SGR deposited $126,900 into Yolo's account. Starting January 2004, SGR paid Yolo as per the SGR agreement, although on two occasions the payments covered multiple months. See infra pp. 14-15.

Also in November 2003 WFR and Yolo entered into an agreement (WFR agreement), according to which Yolo would perform services for WFR and receive $2,116 per month for the services. Other than the party names and compensation, the terms of the two services agreements were identical. WFR paid Yolo pursuant to the WFR agreement, although sometimes payments covered multiple months. WFR did not make a lump-sum payment to Yolo.

C.    The Construction Business After 2003

Ozark Future continued to purchase lots and construct homes that were marketed and sold to the public. By 2004 Ozark Future's business enjoyed increased sales volume; it had multiple homes under construction that were larger and more expensive. SGR was involved in Ozark Future's projects as an owner of Ozark. In Mr. Porschen's absence, Mr. Repetto spent more time on the jobsites. Mrs. Repetto's flexible work schedule allowed her to devote more time to the construction business.

SGR purchased and sold real estate independently of Ozark Future. In 2004 SGR made a deposit to purchase a condominium in Florida, and in 2005 it made

deposits to purchase two additional condominiums in Florida. In 2006 SGR purchased property in Panama, purchased two condominiums in the Lake of the Ozarks area, and sold one of the two condominiums. SGR reported gross receipts (of $176,024) from activities unrelated to Ozark Future for the first time on its 2006 return.

Mr. Repetto reported no salary from SGR for 2004-05 and $24,000 for 2006. Mrs. Repetto did not receive a salary from SGR in 2004-06. Other than Mr. Repetto in 2006, SGR had no employees.

Mr. Repetto received no compensation from Yolo or WFR during 2004-06. Yolo treated Mrs. Repetto as its only employee and paid her $9,600, $9,600, and $12,000 in 2004, 2005, and 2006, respectively. Yolo issued Mrs. Repetto Forms W-2, Wage and Tax Statement, withheld taxes from her paycheck, and made employment tax deposits with the Department of Treasury.

D.    Dividends

During the years at issue SGR made payments to WFR of $7,000 per month for "outside staffing & support".[14] The payments were irregular and sometimes

---

[14]WFR allegedly had a services agreement with SGR, but such agreement is not in the record. On the basis of the record as a whole, we find that no services agreement existed.

covered multiple months. WFR then declared dividends payable to shareholders pro

rata and paid dividends to Mr. Repetto's Roth IRA as follows:

| Date | Amount Declared | Amount paid to Mr. Repetto's Roth IRA[1] |
|------|------|------|
| 5/04/04 | $50,000 | $49,000 |
| 3/10/05 | 20,000 | 19,600 |
| 4/10/06 | 50,000 | 49,000 |
| Total | 120,000 | 117,600 |

[1]The parties stipulated incorrect amounts of dividends that WFR paid to the Roth IRA. The Roth IRA's statement of transactions, WFR's corporate documents, and the general ledger show that the amounts shown in the stipulation were the total dividends WFR declared pro rata. We disregard these stipulations as inconsistent with the record. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).

SGR and WFR paid Yolo pursuant to the agreements, in addition to SGR's

lump-sum payment of $126,900. See supra pp. 11-12. Yolo then declared

dividends payable to each shareholder pro rata and paid dividends to Mrs. Repetto's

Roth IRA as follows:

| Date | Amount Declared | Amount paid to Mrs. Repetto's Roth IRA[1] |
|------|-----------------|-------------------------------------------|
| 5/24/04 | $50,000 | $49,000 |
| 3/9/05 | 80,000 | 78,400 |
| Total | 130,000 | 127,400 |

[1]The parties stipulated incorrect amounts of dividends that Yolo paid to the Roth IRA. The Roth IRA's statement of transactions, Yolo corporate documents, and the general ledger show that the amounts shown in the stipulation were total dividends Yolo declared pro rata. We disregard these stipulations as inconsistent with the record. See id.

Mr. Zerjav made the decisions regarding whether WFR and Yolo would issue dividends to their shareholders.

II.    Yolo's Medical Plan

On January 2, 2004, Mrs. Repetto in her capacity as president of Yolo established a medical and dental care expense reimbursement plan (Yolo medical plan) effective January 1, 2004. According to the Yolo medical plan, Yolo would reimburse medical expenses of eligible employees, their spouses, and dependents. Yolo executives had no limitations on the amounts of expenses that could be reimbursed. On the basis of the Yolo medical plan, Yolo reimbursed the Repettos for their healthcare expenses totaling $8,948, $13,622, and $12,865 in 2004, 2005, and 2006, respectively.

III.    Notice 2004-8, 2004-1 C.B. 333

On December 31, 2003, before petitioners filed their 2003 returns, the Internal Revenue Service (IRS) issued Notice 2004-8, 2004-1 C.B. 333, titled Abusive Roth IRA Transactions.  In Notice 2004-8, supra, the IRS addressed taxpayers' attempts to avoid limitations on contributions to Roth IRAs.  The notice states that the transactions generally involve (1) an individual who owns a preexisting business, (2) a Roth IRA maintained for that individual, and (3) a corporation substantially all the shares of which are owned or acquired by the Roth IRA (Roth IRA corporation).  The notice describes a typical fact pattern to include acquisitions of property from the preexisting business for less than a fair market value and any other arrangement between the Roth IRA corporation and the individual or his business "that has the effect of transferring value to the Roth IRA Corporation comparable to a contribution to the Roth IRA."  Id., 2004-1 C.B. at 333.

The notice also provides that the IRS would challenge the purported tax benefits resulting from such transactions.  Id.  The notice provides that in addition to any other tax consequences that may be present, the amount treated as a contribution is subject to the excise tax under section 4973.  Id.  The notice identifies these transactions, as well as substantially similar transactions, as listed

transactions for purposes of section 1.6011-4(b)(2), Income Tax Regs. Id., 2004-1 C.B. at 334.

## IV. Procedural History

### A. Federal Tax Returns

Mr. Zerjav prepared petitioners' 2004-06 Federal income tax returns. On SGR's Forms 1120S, SGR reported its shares of Ozark Future's business income as $117,110, $311,003, and $289,917[15] for 2004, 2005, and 2006, respectively. SGR also claimed facilities support deductions of $78,200, $205,000, and $132,800 for 2004, 2005, and 2006, respectively, for its payments to WFR and Yolo. SGR reported a business loss of $6,376 for 2004, and the Repettos claimed their distributive share of that loss on their 2004 Schedule E, Supplemental Income and Loss. On the Schedules E of their Forms 1040 for 2005 and 2006 the Repettos reported distributive shares of SGR's net income of $52,701 and $95,174, respectively.

---

[15]The parties stipulated an incorrect amount, and we ignore that stipulation as contrary to the Form 1120S and the Schedule K-1, Partner's Share of Income, Deductions, and Credits, etc.

On its Forms 1120S, WFR reported gross income of $139,924, $56,000, and $140,000[16] for its tax years ending October 31, 2004, 2005, and 2006, respectively. These amounts were the facilities support fees that SGR paid WFR. WFR deducted facilities support expenses of $35,972 and $25,392 for its tax years ending October 31, 2005 and 2006, respectively. These deductions were for the payments WFR made to Yolo. WFR paid Federal income taxes of $30,301, $1,967, and $24,615 for the years at issue. Respondent did not adjust for these tax payments in the notices of deficiency and continues to retain them.

On its Forms 1120S, Yolo included in its gross income the payments from SGR and WFR and reported gross income of $163,596, $122,372, and $75,792 for 2004, 2005, and 2006, respectively. Yolo paid Federal income taxes of $34,395, $15,484, and $5,911 for its tax years ending October 31, 2004, 2005, and 2006, respectively. Respondent did not adjust for these tax payments in the notices of deficiency and continues to retain them.

The Repettos filed their Forms 1040, U.S. Individual Income Tax Return, for the years at issue with the filing status of married filing jointly. They did not file

---

[16]The parties incorrectly stipulated WFR's gross income for the year ending October 31, 2004, and we ignore the stipulation as inconsistent with WFR's 2005 Form 1120S.

Forms 5329, Additional Taxes on Qualified Plans (Including IRAs) and Other Tax-Favored Accounts.

### B. The Notices of Deficiency

In the notice of deficiency issued to the Repettos, respondent determined that Mr. Repetto had compensation from SGR of $22,164 for each of the years 2004 and 2005 and additional compensation of $6,750 for 2006. Respondent made corresponding adjustments to SGR's returns allowing deductions in the same amounts.

Respondent determined that amounts reported as wages of $9,600 and $12,000 that Mrs. Repetto received from Yolo in 2005 and 2006, respectively, were not includable in her taxable income. These adjustments were consistent with the adjustments respondent made to Yolo's returns for 2005 and 2006 disallowing the deductions for wages paid to Mrs. Repetto.

Respondent also adjusted several items on SGR's returns. The only adjustments that remain at issue are the disallowed deductions for facilities support of $78,200, $205,000, and $132,800 for 2004, 2005, and 2006, respectively. Respondent did not explain the reasons for the disallowance in the notice of deficiency. Respondent adjusted the Repettos' distributive shares of income from SGR for 2004-06 to reflect the adjustments to SGR's returns.

In the notice of deficiency issued to the Repettos, respondent determined that "the contributions made for the sole benefit of your Roth IRA Individual Retirement Accounts were excessive contributions and are subject to the applicable excise tax under the provisions of the Internal Revenue Code" and, consequently, the Repettos were liable for the excise tax under section 4973. Respondent also determined that the Repettos did not file the required Forms 5329 and that the Repettos are liable for the section 6651(a)(1) addition to tax for failing to file the Forms 5329 for 2004-06 and the section 6651(a)(2) addition to tax for failing to pay excise tax due on the excess contributions. Respondent also determined that the Repettos are liable for the section 6662A accuracy-related penalty for reportable transaction understatements for 2004-06.

In the notice of deficiency issued to WFR, respondent disallowed the facilities support deductions of $35,972 and $25,392 for taxable years ending October 31, 2005 and 2006, respectively. Because respondent determined that WFR had a reportable transaction understatement for those years, respondent also determined that WFR was liable for the 30% accuracy-related penalty under section 6662A.

In the notice of deficiency issued to Yolo, respondent disallowed in full the medical expense reimbursement deductions Yolo claimed on its 2005 and 2006

returns as well as the deductions for officer compensation expenses discussed above.[17]  Respondent also determined for each year at issue that Yolo was liable for the 30% accuracy-related penalty under section 6662A.

Petitioners timely petitioned this Court.

## OPINION

I.    Burden of Proof

Generally, the Commissioner's determinations in the notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that the determinations are erroneous.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  However, pursuant to section 7491(a), in certain circumstances the burden of proof on factual issues that affect the taxpayer's tax liability "for any tax imposed by subtitle A or B" may shift to the Commissioner.

At trial petitioners made an oral motion to shift the burden of proof under section 7491(a).  On brief petitioners contend that the burden of proof shifts to respondent because they established that the requirements under section 7491(a) are met.  We disagree.  Section 7491(a) applies only to subtitles A and B, which include income taxes and estate and gift taxes.  See also Paschall v. Commissioner, 137

---

[17]Petitioners conceded another adjustment to the Yolo return.  See supra note 4.

T.C. 8, 17 (2011). Respondent determined the excise tax due under subtitle D. By its terms section 7491(a) does not apply to taxes determined under subtitle D, and petitioners bear the burden of proof with respect to the excise tax adjustments.

Respondent's other determinations, such as the determinations to disallow SGR's and WFR's facilities support deductions, Mr. Repetto's compensation from SGR, and Yolo's medical expense reimbursement deductions, are under subtitle A. With respect to these issues, we base our conclusions on the preponderance of the evidence and not on any allocation of the burden of proof. See Knudsen v. Commissioner, 131 T.C. 185, 188-189 (2008).

II.     Excess Contributions to the Roth IRAs and Related Determinations

        A.     Roth IRAs in General

Congress authorized the Roth IRA, a type of a retirement account, with the enactment of section 408A as part of the Taxpayer Relief Act of 1997, Pub. L. No. 105-34, sec. 302, 111 Stat. at 825. The distinguishing feature of a Roth IRA is the back-end timing of the tax benefit: Contributions to a Roth IRA are not tax deductible, but all earnings accumulate tax free, and all qualified distributions are tax free. Sec. 408A(a), (c)(1), (d)(1); Taproot Admin. Servs., Inc. v. Commissioner, 133 T.C. 202, 206 (2009), aff'd, ___ F.3d ___, 2012 WL 933908 (9th Cir. Mar. 21, 2012). By comparison, contributions to a traditional IRA are deductible and

earnings accrue tax free (except with respect to section 511 unrelated business income), but distributions from a traditional IRA are includable in the recipient's gross income. See secs. 219(a), 408(a), (d)(1), (e). Accordingly, the timing of the tax benefit is the critical difference between a Roth IRA and a traditional IRA. Both traditional and Roth IRAs are designed to ensure that the taxpayer includes in income either the amounts the taxpayer contributes to the retirement account or the amount that he withdraws from his account. Cf. secs. 408A(c)(1), 408(d)(1).

The total annual contribution a taxpayer may make to a Roth IRA is effectively limited.[18] Sec. 408A(c)(2) and (3). Although the Code does not prohibit higher contributions, section 4973(a) imposes for each taxable year an excise tax of 6% for excess contributions, computed on the lesser of (1) the amount of the excess contribution, and (2) the value of the account as of the end of the taxable year. The tax applies each year until the excess contributions are eliminated from the taxpayer's Roth IRA. See sec. 4973(b)(2). Section 4973(f) defines an excess

---

[18]The Code establishes a maximum aggregate amount that an individual can contribute to all of his or her Roth IRAs for a taxable year, and that amount is phased out between levels of modified adjusted gross income. See sec. 408A(c)(2) and (3).

contribution to a Roth IRA as the excess of the amount contributed over the amount allowable as a contribution.

B.     The Parties' Arguments

Respondent contends that the Repettos followed the general pattern of Notice 2004-8, supra, and transferred funds into their Roth IRAs in excess of the statutory limits using the purported facilities support agreements.  Relying on the substance-over-form and sham transaction doctrines as well as income shifting cases such as Green v. United States, 460 F.2d 412, 420-421 (5th Cir. 1972), Simon v. Commissioner, 248 F.2d 869, 876-877 (8th Cir. 1957), rev'g and remanding U.S. Packing Co. v. Commissioner, T.C. Memo. 1955-194, and others, respondent contends that when viewed according to the substance of the transaction, the Repettos' deemed contributions to the Roth IRAs were excessive, and the Repettos are liable for the excise tax under section 4973.

Petitioners contend that their corporate structure had a legitimate business purpose of asset protection[19] and that a Roth IRA may own shares of a C corporation.  They maintain that respondent recognized that WFR and Yolo were legitimate business entities by continuing to retain over $112,000 in Federal

---

[19]Because respondent does not argue that WFR and Yolo were sham corporations and should be disregarded, we shall not address petitioners' argument regarding the business purpose and economic substance of these corporations.

corporate income taxes that WFR and Yolo paid during the years at issue and by having allowed many of their deductions. Petitioners also contend that the payments between the entities were legitimate because Yolo provided administrative support, design, and development services to both SGR and WFR, and WFR provided marketing, real estate purchase, design, and development services to SGR.

## C. Analysis

Generally, the substance and not the form of a transaction determines its tax consequences. Gregory v. Helvering, 293 U.S. 465, 469-470 (1935); Lazarus v. Commissioner, 58 T.C. 854, 864 (1972), aff'd, 513 F.2d 824 (9th Cir. 1975). Where a series of transactions, taken as a whole, shows either that the transactions are shams or that the transactions have no "purpose, substance, or utility apart from their anticipated tax consequences", the transactions are not recognized for Federal tax purposes. Goldstein v. Commissioner, 364 F.2d 734, 740 (2d Cir. 1966), aff'g 44 T.C. 284 (1965); see also Commissioner v. Court Holding Co., 324 U.S. 331 (1945).

The parties agree that generally an entity in which substantially all the interest is owned or acquired by a Roth IRA may be recognized as a legitimate business entity for Federal tax purposes. However, in these cases the preponderance of

credible evidence compels a finding that in substance the services agreements and the resulting payments were nothing more than a mechanism for transferring value to the Roth IRAs. The services agreements did not change who provided the services to SGR, and the Repettos continued to do all of the work as they had done before the agreements were allegedly put in place. Petitioners introduced no written agreement with respect to the services WFR purportedly provided to SGR, and we find there was none. The SGR agreement and the WFR agreement were identical. WFR and Yolo did not maintain contemporaneous time records for the services that they allegedly provided to SGR. We also question whether the amounts of the payments were determined in good faith and reflected the value of the services purportedly performed. The amount of the upfront lump-sum payment from SGR to Yolo, $126,900, underscores the lack of normal business dealings between the corporations. We reject petitioners' explanation that Yolo needed working capital as not credible.

The invoices in the record strongly support our conclusion that the services agreements and payments were mechanisms to transfer value to the Roth IRAs. The record contains only two invoices, for $4,800 and $4,000, for the services that Yolo allegedly performed for SGR. The invoice for $4,800 bears as its date a notation "Monthly 2005", and the invoice for $4,000 bears as its date a notation "Monthly

2006".  The invoices describe the allegedly provided services as "Services for Administrative support", "Office support", "Internet:  email processing, material research, marketing information".

The record contains only one invoice for services that Yolo allegedly performed for WFR.  The invoice is for $2,116, and it describes the services as "Services for administrative support" and "Office support".  This invoice also bears as its date a notation "Monthly 2005 and 2006".  There are no invoices issued by WFR to SGR in the record.

The engagement letter between Mr. Harrell and the Repettos supports a finding that the payment of dividends to the Roth IRAs was the primary goal of the facilities support agreements.  Under the engagement letter, Mr. Harrell undertook to coordinate the payment of the first dividend to the Roth IRAs, a step unlikely to be an area of concern for a new corporation under normal business circumstances.

Mr. and Mrs. Repetto testified at length regarding the services WFR and Yolo performed under the services agreements.  Mrs. Repetto testified that Yolo provided SGR with administrative support by entering data into QuickBooks, keeping track of various charges for the construction jobs, and reordering supplies. Mrs. Repetto also testified that Yolo provided design services for SGR, such as

choosing design features for homes. According to Mrs. Repetto, Yolo also provided development services for SGR and WFR during the preconstruction stage, which involved determining features for the new house on the basis of research regarding buyers' preferences.[20]

Mr. Repetto testified about WFR's services to SGR. He testified that WFR found and purchased lots and designed and developed homes. He also testified that he visited other spec homes held for sale to understand what people were interested in buying. After purchasing a lot, WFR had the home for the lot drawn and obtained necessary approvals. Then Mr. Repetto had the lot surveyed and appraised for the purpose of obtaining a construction loan. As the next step, WFR obtained bids from all subcontractors, and WFR was responsible for working with them. According to Mr. Repetto, WFR also provided services to SGR in connection with SGR's projects that were independent of Ozark Future, namely, the Florida and Panama projects.

Mrs. Repetto testified about Yolo's services to WFR. According to her testimony, because Mr. Repetto was on the jobsites and could not do marketing and development or design, Yolo performed those services for WFR. The services

---

[20]This type of design service was performed before construction, and it differed from more technical design services, for example, choosing colors or a specific supplier of an item.

included putting together documentation for the loans and meeting with bank representatives.

Mrs. Repetto also testified about Yolo's support to SGR and WFR in connection with SGR's projects independent of Ozark Future. She claimed that such services included administrative support, office functions, communications, trip planning, and making appointments with real estate agents and condominium developers. She also took care of books and records for SGR and WFR.

We have no doubt that Ozark Future's and SGR's growing businesses required the Repettos' ongoing involvement. Petitioners have proven, and we find that with Mr. Porschen's illness, the Repettos' involvement in Ozark Future's business increased substantially. Petitioners, however, have failed to convince us that the Repettos worked in their capacity as Yolo's and WFR's indirect owners or employees rather than as SGR's owners or that the services provided were worth the amounts paid under the agreements. The circular arrangement among the entities further supports this conclusion. WFR provided various services to SGR, its only client. Yet, WFR subcontracted some of those services to its only subcontractor, Yolo, which, in turn, already provided SGR, its only client, a somewhat overlapping menu of services. There is no credible evidence in the

record that either WFR or Yolo marketed its services to potential clients beyond SGR.

Petitioners rely on <u>Swanson v. Commissioner</u>, 106 T.C. 76 (1996), in which an IRA-owned domestic international sales corporation (DISC) received commissions from a corporation wholly owned by the taxpayer. However, in <u>Swanson</u>, the central issue was whether the IRS was substantially justified in its litigation position for the purpose of determining whether the taxpayer was entitled to an award of reasonable litigation costs.[21] The issue in these cases is different. On these facts we find that the agreements and the payments made pursuant thereto were designed to permit and permitted the Repettos to make excess contributions to the Roth IRAs through the disguised service payments.

Relying on <u>Hellweg v. Commissioner</u>, T.C. Memo. 2011-58, petitioners also contend that respondent failed to treat the transaction consistently for section 4973

---

[21]In <u>Swanson v. Commissioner</u>, 106 T.C. 76, 87-88 (1996), the Commissioner maintained that the IRA's acquisition of the DISC's stock was a prohibited transaction under sec. 4975(c)(1)(A). We concluded that the DISC was not a disqualified person under sec. 4975(e)(2)(G) and that therefore the issuance of the stock to the IRA was not a prohibited transaction. <u>Swanson v. Commissioner</u>, 106 T.C. at 88-89. The Commissioner also contended that the payments of dividends by the DISC to the IRA qualified as prohibited transactions under sec. 4975(c)(1)(E), but we disagreed. <u>See id.</u> at 89. Accordingly, we held that the Commissioner's litigation position was not substantially justified. <u>Id.</u> at 91-92.

and income tax purposes.  In Hellweg, the taxpayers owned an S corporation.  The

taxpayers established Roth IRAs.  The Roth IRAs formed a DISC which entered

into a commission agreement with the S corporation.  Each Roth IRA subsequently

contributed its ownership interest in the DISC to a C corporation in exchange for all

of that corporation's unissued stock.  Because of the DISC's tax treatment under the

Code, the C corporations reported and paid applicable Federal income taxes

resulting from the commission fees.  Each C corporation then distributed some

amount as a dividend to the Roth IRA shareholder.  The Commissioner determined

that the transaction resulted in excess contributions subject to the section 4973

excise tax.  The Commissioner, however, made no adjustments for Federal income

tax purposes.

In Hellweg, we held that the transactions must be treated consistently for

section 4973 and income tax purposes.  We stated:

> Pursuant to Notice 2004-8, supra, reallocation of income or
> recharacterization of the Transaction should have resulted in:  (1)
> Refund of income taxes paid by the C corporations on the dividend
> income from * * * [the DISC], (2) reduction or denial of the deductions
> claimed by * * * [S corporation] for the * * * commission payments,
> (3) additional passthrough S corporation income to petitioners from * *
> * [S corporation], and (4) income to petitioners under section 1368 to
> the extent, if any, the distributions they were deemed to have received
> from * * * [the S Corporation] exceeded their bases in * * * [the S
> corporation].

However, in <u>Hellweg</u>, the Commissioner made no such adjustments.  We stated that because the Commissioner made no section 482 adjustment which would result in distributions from the S corporation to the taxpayers for income tax purposes, the commission payments cannot be treated as excess contributions to petitioners' Roth IRAs.  <u>See</u> <u>id.</u>; <u>see also</u> <u>Ohsman v. Commissioner</u>, T.C. Memo. 2011-98.

We have a different set of adjustments in the notices of deficiency in these cases.  Although respondent did not make a section 482 reallocation, he disallowed all of the business expense deductions SGR claimed for its payments to WFR and Yolo.  These income tax adjustments are consistent with the excise tax adjustments at issue, and <u>Hellweg</u> is therefore distinguishable.

Petitioners also failed to prove that respondent's disallowance of SGR's and WFR's claimed deductions for facilities support expenses under section 162 and/or for lack of substantiation was erroneous.  Generally, section 162(a) allows as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.  Whether an expenditure is ordinary and necessary is generally a question of fact.  <u>Commissioner v. Heininger</u>, 320 U.S. 467, 475 (1943).  An expense is ordinary if it is customary or usual within a particular trade, business, or industry or relates to a transaction "of common or

frequent occurrence in the type of business involved." <u>Deputy v. du Pont</u>, 308 U.S. 488, 495 (1940).  An expense is necessary if it is appropriate and helpful for the business.  <u>See</u> <u>Commissioner v. Heininger</u>, 320 U.S. at 471.  Only the portion of an expense that is reasonable qualifies for deduction under section 162(a).  <u>United States v. Haskel Engg. & Supply Co.</u>, 380 F.2d 786, 788-789 (9th Cir. 1967).  In addition, taxpayers must keep sufficient records to substantiate any deductions otherwise allowed by the Code.  Sec. 6001.

We agree with respondent that petitioners have failed to prove that the payments under the services agreements were necessary or reasonable.  In addition, SGR's and WFR's form invoices fall short of satisfying the substantiation requirements of the Code.  We sustain respondent's disallowance of the deductions SGR and WFR claimed for facilities support.

D.    <u>Computational Matters</u>

We now address the amounts of the excess contributions.  Generally, section 4973(f) defines an excess contribution to a Roth IRA as the excess of the amount contributed over the amount allowable as a contribution.  Respondent's position on the issue has been far from consistent.  In the notice of deficiency issued to the Repettos, respondent calculated the amount contributed to each Roth IRA as the sum of the increase to the net asset value of WFR and Yolo and dividends paid to

the respective Roth IRAs. On brief respondent stands by his calculation but argues that the transactions should be recharacterized as follows: (1) The amounts transferred from SGR to WFR and Yolo should be treated as distributions from SGR to the Repettos, and (2) the distributions should then be treated as contributed by the Repettos to the Roth IRAs.[22] We disagree with respondent's methodology.

In Paschall v. Commissioner, 137 T.C. at 19-20, another case involving a tax-motivated transaction with a Roth IRA (conversion of a traditional IRA into a Roth IRA) that we decided after Hellweg v. Commissioner, T.C. Memo. 2011-58, we held that the amount contributed and thus, the excise tax deficiencies were to be calculated on the basis of the fair market value of the Roth IRA at yearend. Similarly, an amount of the Repettos' contributions to the Roth IRAs (and, as the next step, excess contributions) should be calculated on the basis of the values of their Roth IRAs at the end of each tax year.[23] See id. Because we do not

---

[22]Respondent's calculations ignore corporate taxes that WFR and Yolo paid.

[23]There were no distributions from the Roth IRAs, and the record does not allow us to conclude that the value of the Roth IRA increased for a reason other than the contributions.

On brief respondent admits that in the notice of deficiency he failed to include all the dividends to the Roth IRAs and, specifically, that he omitted (1) a

(continued...)

adopt respondent's recharacterization as described in his brief, the corporate taxes that Yolo and WFR paid are irrelevant for the purpose of calculating excess contributions for excise tax purposes.[24]

## III. Other Adjustments

### A. Mr. Repetto's Compensation From SGR

As discussed above, in the notice of deficiency issued to the Repettos, respondent determined that Mr. Repetto had compensation from SGR of $22,164 for each of the years 2004 and 2005 and additional compensation of $6,750 for 2006. Respondent allowed corresponding deductions on SGR's returns. Petitioners maintain that the payments to Mr. Repetto were distributions rather than wages.

_____

[23](...continued)
$50,000 dividend from Yolo to Mrs. Repetto's Roth IRA dated May 24, 2004, and (2) two $50,000 dividends from WFR to Mr. Repetto's Roth IRA dated May 4, 2004, and May 13, 2006. Notably, respondent calculates the contributions using the total rather than pro rata dividends. Because we follow Paschall v. Commissioner, 137 T.C. 8 (2011), and treat the yearend value of the Roth IRA as the amount contributed to the respective Roth IRA, respondent's failure to include all of the dividends in his calculation as well as the use of slightly inflated numbers as dividends are irrelevant.

[24]Because the facilities support agreements were shams, the parties shall exclude income that WFR and Yolo received under those agreements during 2005 and 2006 from income used in the Rule 155 computations. See sec. 6512; cf. Winter v. Commissioner, 135 T.C. 238, 244 (2010).

SGR's general ledgers show regular monthly payments of $1,847 to Mr. Repetto identified as "Payroll expenses", "Salary & Wages (Payroll)", or "Salary". Mr. Repetto explained that the QuickBooks entries listed the payments as salary "just to keep track of the money" that he took out of SGR. At the end of 2004 and 2005, the payments were reclassified as loans. However, the regular timing of the payments, the consistent amounts, and the contemporaneous descriptions in the general ledger support a finding that Mr. Repetto received wages rather than distributions. We sustain respondent's adjustments to this item for 2004 and 2005.

With respect to 2006, $6,750 shown as Mr. Repetto's wages in the journal entries does not exceed the wages from SGR that Mr. Repetto reported on his Form 1040. Because the record does not show that Mr. Repetto had additional compensation income of $6,750 for 2006, we do not sustain respondent's adjustment to this item for 2006.

B.   Mrs. Repetto's Compensation From Yolo and the Medical
     Expense Reimbursement Deductions

Yolo deducted as officer compensation expenses payments to Mrs. Repetto. Yolo also deducted reimbursements of the Repettos' medical expenses. Respondent disallowed these deductions because the employment relationship between Yolo and Mrs. Repetto was a sham.

As discussed above, we cannot conclude on this record that Mrs. Repetto performed work in her capacity as Yolo's employee or officer. Consistent with our conclusion above, we sustain respondent's disallowance of these deductions.

IV.    Additions to Tax and Penalties

   A.    Burden of Proof

Respondent bears the burden of production with regard to the section 6651(a)(1) and (2) additions to tax and the section 6662A penalties. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). To meet his burden, respondent must produce sufficient evidence that it is appropriate to impose them. See Higbee v. Commissioner, 116 T.C. at 446. Respondent does not have to produce evidence of reasonable cause, substantial authority, or lack of willful neglect. See id.

   B.    Section 6651(a)(1) and (2) Additions to Tax

In the case of a failure to file timely any return required under section 6011(a), section 6651(a)(1) imposes an addition of 5% of the tax required to be shown on the return for each month or fraction thereof for which there is a failure to file, not to exceed 25% in the aggregate. Generally, "any person made liable for any tax * * * shall make a return or statement according to the forms and regulations

prescribed by the Secretary."[25]  Sec. 6011(a).  The addition to tax does not apply if the failure to file timely is due to reasonable cause and not due to willful neglect.

Taxpayers are required to file a Form 5329 for each year they have excess contributions to their IRAs.  See Paschall v. Commissioner, 137 T.C. at 21; Frick v. Commissioner, T.C. Memo. 1989-86, aff'd without published opinion, 916 F.2d 715 (7th Cir. 1990).  Form 5329 is a tax return within the meaning of section 6011, and failure to file it can result in the section 6651(a)(1) addition to tax.  Paschall v. Commissioner, 137 T.C. at 21.  We have found that the Repettos had excess contributions.  Also, they did not file the Forms 5329.  Respondent therefore has met his burden of production.

Section 6651(a)(2) imposes an addition to tax for failure to pay timely the amount of tax shown on a return.  The section 6651(a)(2) addition to tax applies only when an amount of tax is shown on a return.  Cabirac v. Commissioner, 120 T.C. 163, 170 (2003).  Where the taxpayer did not file a valid return, to satisfy the burden of production for the section 6651(a)(2) addition to tax the Commissioner must introduce evidence that he prepared a substitute for return satisfying the

---

[25]The term "Secretary" means the Secretary of the Treasury or his delegate. Sec. 7701(a)(11).

requirements under section 6020(b). <u>Wheeler v. Commissioner</u>, 127 T.C. 200, 208-209 (2006), <u>aff'd</u>, 521 F.3d 1289 (10th Cir. 2008). A return made by the Secretary under section 6020(b) is treated as the return filed by the taxpayer for purposes of section 6651(a)(2). Sec. 6651(g)(2). Respondent satisfied his burden by introducing into evidence Form 13496, IRC Section 6020(b) Certification.

The Repettos contend that the failure to file the Forms 5329 and pay the excise tax was due to reasonable cause and not due to willful neglect. They claim that they relied in good faith on Messrs. Zerjav and Harrell.

Generally, the failure to timely file a return is considered to be due to reasonable cause where a taxpayer is unable to file the return within the prescribed time despite exercising "'ordinary business care and prudence.'" <u>Jackson v. Commissioner</u>, 86 T.C. 492, 538 (1986) (quoting section 301.6651-1(c)(1), Proced. & Admin. Regs.), <u>aff'd</u>, 864 F.2d 1521 (10th Cir. 1989). Willful neglect is defined as a "conscious, intentional failure or reckless indifference". <u>United States v. Boyle</u>, 469 U.S. 241, 245 (1985). While good faith reliance on professional advice may provide a basis for a reasonable cause defense, it is not absolute. <u>Freytag v. Commissioner</u>, 89 T.C. 849, 888 (1987), <u>aff'd</u>, 904 F.2d 1011 (5th Cir. 1990), <u>aff'd</u>, 501 U.S. 868 (1991). The advice must be from competent and independent

parties rather than from promoters of the investment or advisers with a conflict of interest. Paschall v. Commissioner, 137 T.C. at 22.

The Repettos hired Messrs. Zerjav and Harrell to set up the structure knowing about the limitations on contributions to Roth IRAs and not fully understanding the structure. As evidenced by Mrs. Repetto's email to Mr. Harrell, the Repettos suspected the arrangement was improper, but relied on Mr. Harrell's summary denial to allay their concerns. Messrs. Zerjav and Harrell were the advisers who suggested the structure, and petitioners' reliance on their advice as to the proper tax treatment of the transaction was unreasonable. Petitioners failed to establish that they meet the reasonable cause exception to the section 6651(a)(1) and (2) additions to tax. Therefore, we sustain respondent's imposition of these additions to tax.

### C.  Section 6662A Penalties

#### 1.  Section 6662A in General

Section 6662A provides that "If a taxpayer has a reportable transaction understatement for any taxable year, there shall be added to the tax an amount equal to 20% of the amount of such understatement." The penalty applies to any deficiency which is attributable to any listed transaction or any reportable transaction if a significant purpose of the transaction is the avoidance or evasion of

Federal income tax.  Sec. 6662A(b)(2).  The penalty is increased from 20% to 30% of the amount of the understatement if the disclosure requirements of section 6664(d)(2)(A), requiring disclosure in accordance with the regulations under section 6011, are not met.  Sec. 6662A(c).

>    2.    The Parties' Arguments and Analysis

Respondent argues that the Repettos, WFR, and Yolo are liable for the penalty because they participated in a listed transaction.  A listed transaction is a transaction that is the same as or substantially similar to one of the types of transactions that the IRS has determined to be a tax avoidance transaction and has identified by notice, regulation, or other form of published guidance as a listed transaction.  Sec. 6707A(c)(2); see also BLAK Invs. v. Commissioner, 133 T.C. 431, 445 (2009).  Respondent claims that the transaction is substantially similar to the transaction described in Notice 2004-8, supra.

The regulations define the term "substantially similar" as "any transaction that is expected to obtain the same or similar types of tax consequences and that is either factually similar or based on the same or similar tax strategy."  Sec. 1.6011-4(c)(4), Income Tax Regs.  The consequence of the transactions described in Notice 2004-8, supra, is avoiding the limitations on contributions to Roth IRAs.  This is what the transaction in these cases achieved.  Moreover, the transaction described in

the notice is factually similar to the transaction at issue here. The transaction described in the notice has the same types of parties as the transaction in these cases, namely, an individual who owns a preexisting business, a Roth IRA that is maintained for that individual, and a Roth IRA corporation. The examples of transactions described in the notice include "any other arrangement between the Roth IRA Corporation and the Taxpayer, a related party * * *, or the Business that has the effect of transferring value to the Roth IRA Corporation comparable to a contribution to the Roth IRA." Notice 2004-8, supra. The facilities support agreements and payments between SGR and WFR and Yolo are exactly the same type of arrangement in that the agreements and payments have the effect of transferring value to the Roth IRA corporations.

Respondent claims that petitioners are liable for the increased 30% penalty. Petitioners filed their Federal income tax returns but did not attach disclosure statements as described in section 1.6011-4(c), Income Tax Regs., or any materially similar documents, indicating their participation in the transaction to the returns. Therefore, petitioners are liable for the increased 30% penalty. See sec. 6662A(c).

Section 6664(d) provides that under certain circumstances a taxpayer may avoid section 6662A penalties if there was reasonable cause for the taxpayer's

treatment of the listed transaction and the taxpayer acted in good faith. However, this exception applies only if the transaction was disclosed in accordance with the regulations prescribed under section 6011. Sec. 6664(d)(2)(A). Petitioners did not disclose their participation in the transaction in accordance with the regulations under section 6011. Accordingly, petitioners do not qualify for relief from the section 6662A penalty under the reasonable cause exception.

Petitioners point out that the disclosure component in the structure of the reasonable cause defense as applicable to the section 6662A penalty differs from the reasonable cause exception for the section 6662(a) penalty, found in section 6664(c)(1). In their view the limitation upon the reasonable cause exception violates petitioners' constitutional right to due process of law and conflicts with the reasonableness standard outlined in Boyle, 469 U.S. 241. For reasonable cause to apply under section 6662(a), the taxpayer must have exercised ordinary business care and prudence as to the disputed item, see id. at 251-252, and in petitioners' view, the additional disclosure requirement of section 6664(d)(2)(A) violates this standard. Petitioners believe that they in fact had reasonable cause because they relied on their advisers to attach to petitioners' returns all required forms, which the advisers did not, yet petitioners are unable to rely on the reasonable cause exception because of the disclosure requirement.

We reject petitioners' argument.  To fall within the protection of the Due Process Clause, petitioners must show that the assessment of the penalties is so harsh and oppressive as to transgress the constitutional limitation.  See, e.g., McGehee Family Clinic v. Commissioner, T.C. Memo. 2010-202.  The penalty structure of section 6662A does not do so.

Petitioners also contend that their due process rights have been violated because the language "substantially similar" set forth in Notice 2004-8, supra, is void for vagueness.  Petitioners believe that there is no clear guidance in section 1.6011-4(c)(4), Income Tax Regs., as to what makes a transaction "substantially similar" to a listed transaction.

We reject petitioner's argument.  As the Supreme Court stated in Grayned v. City of Rockford, 408 U.S. 104, 108 (1972), "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." The vagueness doctrine is concerned with the requirement of explicit guidelines to avoid arbitrary and discriminatory enforcement, and it requires specificity in laws sufficient to inform those subject to the law as to its meaning.  Big Mama Rag, Inc. v. United States, 631 F.2d 1030, 1035 (D.C. Cir. 1980).  Under the vagueness doctrine, courts may invalidate laws if "'men of common intelligence must

necessarily guess at its meaning.'" Id. (quoting Hynes v. Mayor of Oradell, 425 U.S. 610, 620 (1976)); see also United States v. Derezinski, 945 F.2d 1006, 1010 (8th Cir. 1991). It is apparent that Notice 2004-8, supra, addresses transactions structured to circumvent the statutory limitations on contributions to Roth IRAs. The notice specifies what type of entities or individuals the transaction typically involves. We find no unconstitutional vagueness in Notice 2004-8, supra.

### 3. Calculation of the Amount of the Penalty

Although we sustain the imposition of the section 6662A penalties, we disagree with certain aspects of respondent's calculations. Generally, section 6662A applies, as relevant here, "to any item which is attributable to" any listed transaction. Sec. 6662A(b)(2)(A). Respondent, however, calculated the penalty by including an overly broad range of adjusted items. In particular, he imposed the penalty on the following adjustments: (1) Mr. Repetto's wages from SGR and all Schedule E adjustments (including the facilities support adjustment) to the Repettos' returns, (2) facilities support adjustments to WFR's returns, and (3) medical expense reimbursement, selling-related expenses, and officer compensation expense adjustments to Yolo's returns. Not all of these adjustments, however, are attributable to the listed transaction. The Schedule E adjustments included disallowance of selling-related expenses, rent and occupancy expenses, and

auto/local travel expenses.  Unlike the facilities support deduction, these items are not attributable to the facilities support arrangements between SGR and the Roth IRA corporations.  Similarly, the disallowance of the medical expense reimbursement deductions and the officer compensation expense deductions relating to Mrs. Repetto's salary is attributable to Yolo's claiming improper deductions, not to petitioners' participation in a listed transaction.  We expect respondent to adjust his calculations of the section 6662A penalties accordingly during the Rule 155 process.

We have considered the remaining arguments made by the parties, and to the extent not discussed above, we conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

Decisions will be entered

under Rule 155.