T.C. Memo. 2019-82

UNITED STATES TAX COURT

SAMUEL WEGBREIT AND ELIZABETH J. WEGBREIT, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

THE SAMUEL WEGBREIT TRUST FUND, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 7109-13, 15305-13.       Filed July 8, 2019.

John E. Rogers, for petitioners.

Lauren N. May, David A. Lee, Angela B. Reynolds, Michelle E. Marcove,
Naseem Jehan Khan, Thomas F. Harriman, and Tess Deliefde, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  Respondent determined deficiencies, penalties, and
additions to tax in the individual petitioners' Federal income tax as follows:

[*2] Samuel and Elizabeth J. Wegbreit (Docket No. 7109-13)[1]

| | | | | Additions to tax | |
| Year | Deficiency | Excise tax sec. 4973(a) | Penalty sec. 6662 | Sec. 6651(a)(1) | Sec. 6651(a)(2) |
|------|-----------|------------------------|-------------------|-----------------|-----------------|
| 2005 | $1,596,298.00 | --- | $319,260 | --- | --- |
| 2006 | 32,733.00 | --- | 6,512 | --- | --- |
| 2007 | 525,381.50 | $23,674.26 | 188,660 | $5,327 | $5,919 |
| 2008 | 13,200.00 | 24,173.10 | 1,665 | 5,439 | 5,318 |
| 2009 | 8,068.00 | 20,352.90 | 1,614 | 4,579 | 3,256 |

[1]The parties stipulated that petitioners Wegbreit were not liable for sec. 6662A penalties for 2006 and 2007.

The Samuel Wegbreit Trust Fund (Docket No. 15305-13)

| | | Additions to tax | | |
| Year | Deficiency | Sec. 6654 | Sec. 6651(a)(1) | Sec. 6651(a)(2) |
|------|-----------|-----------|-----------------|-----------------|
| 2005 | $1,589,646.55 | $63,765.49 | $357,670.47 | $397,411.64 |
| 2006 | 24,850.05 | 1,175.95 | 5,591.26 | 6,212.51 |
| 2007 | 92,383.95 | 4,204.67 | 20,786.39 | 23,095.99 |
| 2008 | 13,241.50 | 425.57 | 2,979.34 | 2,913.13 |
| 2009 | 25,275.75 | 605.10 | 5,687.04 | 4,044.12 |

After the petitions were filed, respondent filed an amended answer asserting that

Samuel Wegbreit (S. Wegbreit) and Elizabeth J. Wegbreit (E. Wegbreit) were each

**[*3]** liable for penalties for fraud pursuant to section 6663 for 2005 through 2009. The cases were consolidated for trial, briefing, and opinion.

After concessions and as a result of the stipulations, the issues remaining for decision are: (1) whether S. Wegbreit and E. Wegbreit had unreported income for 2005 through 2009; (2) whether the assets held by the Samuel Wegbreit Trust Fund (SWTF) are the assets of petitioners Wegbreit for which they were required to take into account the income, deductions, and credits of SWTF in computing their taxable income for 2005 thought 2009; (3) whether S. Wegbreit transferred his interest in Oak Ridge Investments, LLC (Oak Ridge, LLC), to SWTF on or before January 1, 2005; (4) whether gain realized on the sale of S. Wegbreit's Oak Ridge, LLC interest to Pioneer Investment Management USA (Pioneer) was includable in petitioners Wegbreit's gross income for 2005; (5) whether the purported exchange of the Threshold Alliance, Ltd. (Threshold), variable life insurance policy (Threshold policy) for the Acadia Life, Ltd. (Acadia), variable life insurance policy (Acadia policy) qualified for nonrecognition treatment under section 1035; (6) whether petitioners Wegbreit are liable for excise tax on excess individual retirement account (IRA) contributions under section 4973(a) and additions to tax under section 6651(a)(1) and (2) for 2007 through 2009; and (7) whether petitioners Wegbreit are each liable for fraud penalties under section

**[*4]** 6663 for 2005 through 2009, or in the alternative accuracy-related penalties under section 6662(a). Unless otherwise indicated all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioners Wegbreit resided in Illinois when their petitions were filed. SWTF was a Colorado trust when its petition was filed. S. Wegbreit was born in 1957, and he graduated from Brown University with a degree in applied mathematics in 1979. At all material times S. Wegbreit worked in the financial industry. E. Wegbreit was born in 1963. She graduated from the College of St. Catherine in 1985 and received a master of science degree in maternal child health in 1995 from the University of Illinois at Chicago. Petitioners Wegbreit were married in 1994, they remained married to each other at all material times, and they filed a joint return for each of the years in issue. They have two children, a son born in 1994 and a daughter born in 1996.

**[*5]** <u>The Oak Ridge Companies</u>

S. Wegbreit started Oak Ridge Investments, Inc. (Oak Ridge, Inc.), together with David Klaskin in 1989 as a retail broker-dealer. From the beginning, S. Wegbreit ran all of the compliance, operations, and finance functions for Oak Ridge, Inc., and Klaskin focused on marketing and the investment side of the business. Oak Ridge, Inc. eventually added a registered investment adviser service to its business.

On March 3, 1997, S. Wegbreit and Klaskin formed Oak Ridge, LLC to shield the value of the registered investment adviser business from any litigation risks involving the broker-dealer portion of the business. The registered investment adviser portion was placed in Oak Ridge, LLC, and Oak Ridge, Inc. retained the broker-dealer portion of the business and certain assets such as office equipment.

At the time Oak Ridge, LLC was formed, Klaskin received a 50% membership interest, S. Wegbreit received a 37.5% membership interest, and the remaining 12.5% interest was divided equally among five minority members. The March 3, 1997, Oak Ridge, LLC operating agreement (Oak Ridge, LLC operating agreement) contained provisions that restricted transfer of members' interests including the following:

**[*6]** Article XVI

Transfer of Membership Interest

16.1 A Member shall not voluntarily assign, gift, sell, transfer, pledge or otherwise encumber its Interest, or any portion thereof, or any other rights of a Member without complying with the terms of this Operating Agreement, including without limitation, the provisions of Section 16.5 of this Operating Agreement.

16.2 The proposed assignee or transferee of a Member's Interest (in compliance with this Article XIV [sic]) may be admitted to the Company as a Member in the place and stead of, or together with, as the case may be, the Member who has assigned or transferred his Interest(s) upon satisfaction of all of the following conditions:

> (a) Approval of the Members (in accordance with Section 11.3 of this Operating Agreement) to such substitution shall be obtained, the granting or denial of which shall be within the sole discretion of each such voting Members.

> (b) The assignor and the assignee must execute and deliver such other instruments as counsel to the Company may deem necessary or desirable to effect such admission, including the written acceptance and adoption by the assignee of the provisions of this Operating Agreement.

After all of the foregoing conditions have been fulfilled and the assignee has been admitted to the Company as a Member, the Member-Managers shall amend Exhibit B hereto to reflect the assignee's admission to the Company as a Member.

\*        \*        \*        \*        \*        \*        \*

**[\*7]** 16.5 Right of First Refusal

(a) If a Member wants to transfer any or all of the Member's Interest to a party other than the Company or to David M. Klaskin (a "Third Party"), the member agrees (unless the transfer is part of a transfer that includes the transfer by David M. Klaskin or his successors or assigns of a majority of his or their Interests) prior to transferring such Interests to such Third Party to offer such Interests as set forth in this Section 16.5.

    \*        \*        \*        \*        \*        \*        \*

(d) \* \* \* It is expressly understood that the transfer of any Interests made in conflict with or in derogation of any of the terms, provisions or conditions of this Operating Agreement shall be of no legal force or effect or validity whatsoever.

After the formation of Oak Ridge, LLC, Klaskin focused on the investment advisory service while S. Wegbreit oversaw the compliance, operations, and finance needs for both Oak Ridge, Inc. and Oak Ridge, LLC (Oak Ridge companies). Klaskin generally left all of these matters to S. Wegbreit's discretion.

As vice chairman of the Oak Ridge companies S. Wegbreit fulfilled the combined roles of chief financial officer and chief operations officer. He was a signatory on the Oak Ridge companies' bank accounts, oversaw issuing the companies' payroll checks, and wrote the distribution checks for Oak Ridge, LLC members. He also maintained the Oak Ridge companies' books and supplied all

**[*8]** the information necessary for the companies' accountant to prepare the ledgers and tax filings. He served as Oak Ridge, LLC's tax matters partner from 1997 until 2002. These responsibilities required him to deal directly with the accountants and lawyers that served the Oak Ridge companies. When Klaskin took over the role of Oak Ridge, LLC's tax matters partner in 2002, S. Wegbreit's supervisory role over the Oak Ridge companies' finances and operations continued unchanged. At the end of each year S. Wegbreit gave Klaskin a big-picture summary, but not a line-by-line review, of the Oak Ridge companies' finances.

In the years following the formation of Oak Ridge, LLC, the company's investment advisory service grew increasingly profitable. In or about 2000 Oak Ridge, LLC had funds of $1 billion under management. By September 2004 this amount had increased to $1.5 billion. Oak Ridge, LLC reported income from investment advisory fees reported on its Forms 1065, U.S. Return of Partnership Income, as follows:

[*9]

| Year | Investment advisory fee income |
|------|-------------------------------|
| 1997 | $628,116 |
| 1998 | 2,096,007 |
| 1999 | 2,532,594 |
| 2000 | 3,683,921 |
| 2001 | 4,417,403 |
| 2002 | 5,731,909 |
| 2003 | 5,808,091 |
| 2004 | 8,400,660 |

The value of Oak Ridge, LLC was based on the company's investment advisory service, which was broadly attributed to Klaskin's leadership and depended on his continued participation in the company. As Oak Ridge, LLC continued to grow, Klaskin and S. Wegbreit considered expanding the business by selling a portion of Oak Ridge, LLC's membership interest.

In or about 2000 Federated, a Pittsburgh-based firm, approached Klaskin about buying Oak Ridge, LLC. Klaskin and S. Wegbreit agreed that they would sell the Oak Ridge companies in their entirety for an above-market price of $50 million. Federated declined to purchase the Oak Ridge companies; however, the company offered to hire Klaskin without taking a stake in the Oak Ridge

[*10] companies.  Klaskin declined Federated's employment offer.  Federated and other potential partner firms already had their own compliance and finance management teams, and they did not see value in S. Wegbreit's continued role at the Oak Ridge companies.  Following the discussions with Federated, Klaskin, S. Wegbreit, and the other Oak Ridge, LLC members reached a consensus that the value of the company was $30 million.  In 2002 Oak Ridge, LLC retained the investment banking firm of Keefe, Bruyette & Woods to assist Oak Ridge, LLC with finding a partner firm.

In or about June 2003 Pioneer, an investment firm, expressed an interest in purchasing an equity stake in Oak Ridge, LLC.  On or about July 17, 2003, Klaskin, S. Wegbreit, and the other directors of Oak Ridge Funds, Inc., an Oak Ridge, LLC subsidiary, held a board meeting.  At the meeting they discussed the quarterly performance of the Oak Ridge Small Cap Equity Fund and the Oak Ridge Large Cap Equity Fund (collectively Oak Ridge funds).  During the meeting Klaskin stated that the Oak Ridge funds' adviser, Oak Ridge, LLC, was actively looking for ways to attract additional assets to the funds and improve their distribution.  Shortly after this board meeting Pioneer entered into a transfer agreement to purchase the Oak Ridge funds on September 22, 2003, which was then amended on January 7, 2004.  On February 10, 2004, S. Wegbreit voted as

[*11] proxy for the shareholders of the Oak Ridge funds to approve a plan of reorganization by which the assets of each fund would be transferred to Pioneer solely in exchange for stock.

During this time Klaskin negotiated an agreement to sell to Pioneer a minority interest in Oak Ridge, LLC based on a $30 million valuation of the company. Because of his command of the Oak Ridge companies' operations, S. Wegbreit played an essential role in due diligence involved in the negotiations.

On March 10, 2004, Pioneer by letter proposed to acquire a 49% interest in Oak Ridge, LLC, which included all S. Wegbreit's and the other minority members' interests in the company, for $14.7 million. Klaskin and the other members of his investment team would retain a 51% majority interest. Pioneer and the other equity holders of Oak Ridge, LLC agreed to pay S. Wegbreit a premium of $2.5 million beyond his proportionate share of the company's value to induce him to agree to sell his entire interest.

Pioneer and Oak Ridge, LLC eventually agreed to a final purchase price of $17.2 million. Oak Ridge, LLC entered into a purchase agreement with Pioneer on September 14, 2004, and issued a press release that same day that announced both the deal with Pioneer and S. Wegbreit's planned retirement from the company. On January 7, 2005, Pioneer wired Agresti & Associates, LLC (Agresti

[*12] & Associates), $11,333,710 which comprised $8,833,710 for S. Wegbreit's membership interest in Oak Ridge, LLC and the agreed-upon premium of $2.5 million. On January 10, 2005, Klaskin acknowledged that the purchase price had been fully distributed to all of the selling equity holders.

On January 3, 2005, S. Wegbreit signed a one-year consulting agreement to continue with Oak Ridge, LLC. Klaskin had arranged for the consulting agreement so that S. Wegbreit could assist his successor, Alan E. Molotsky, with the transition. According to the consulting agreement, S. Wegbreit would assist Oak Ridge, LLC as needed for a maximum of eight days per month. In exchange for his consulting services Oak Ridge, LLC paid S. Wegbreit $25,000 per quarter. As part of the consulting arrangement S. Wegbreit agreed to a three-year noncompetition agreement that prohibited him from competing with Oak Ridge, LLC directly or indirectly.

SWTF

At some point during 2003, S. Wegbreit invited Klaskin to attend a meeting about tax planning with financial planner Rob Leon and Colorado attorney Thomas J. Agresti. At this meeting Leon and Agresti recommended using a trust to purchase an offshore life insurance policy for tax planning. Agresti and Leon proposed that S. Wegbreit assign his ownership interest in Oak Ridge, LLC and

[*13] the distributions from Oak Ridge, LLC to a trust. The trust would then transfer the Oak Ridge, LLC interest to an offshore life insurance company policy as a purported premium payment. S. Wegbreit would continue to retain control of his interest in Oak Ridge, LLC while directing investments the insurance company and the trust made. Following the meeting S. Wegbreit decided to follow Agresti's and Leon's advice and sought Agresti's help in developing a tax planning strategy. S. Wegbreit did not conduct any further research into Agresti's and Leon's proposed strategy or seek independent advice regarding its legality.

As part of Agresti's tax planning strategy S. Wegbreit formed SWTF. S. Wegbreit explained to Klaskin that he intended to use SWTF to shelter the membership distributions he received and to lower his tax liability. While Klaskin was concerned that Agresti's and Leon's strategy risked involving adversarial investors in Oak Ridge, LLC's ownership, he did not object. Klaskin understood that S. Wegbreit would transfer his interest only on paper, without changing the ownership or daily management of the Oak Ridge companies. Because Klaskin viewed the transfer as tax planning rather than an actual transaction or sale, he did not exercise his right of first refusal under the Oak Ridge, LLC operating agreement.

**[*14]** 1.     SWTF Formation

Agresti prepared three versions of the SWTF formation agreement, each of which includes a cover sheet dated March 11, 2003. All three SWTF agreement versions state that "[t]his Agreement made and signed this 1st day of March 2003". All three versions were signed by S. Wegbreit as grantor and Agresti on behalf of Agresti & Associates as trustee. All three versions include an attachment titled "schedule A", listing the property S. Wegbreit transferred to the trust at the purported time of formation.

The three versions of the SWTF agreement have conflicting notary verifications and dates on their signature pages and include conflicting schedules of trust assets. The first SWTF agreement includes a verification by an Illinois-commissioned notary public dated March 25, 2003. The notary's verification includes the handwritten error "~~Febru~~" before the handwritten month and day. The first SWTF agreement includes Agresti's certification dated March 11, 2003, that he appeared and provided a sworn statement as the managing member of Agresti & Associates that the agreement was the free act of the firm as trustee. At all material times Agresti was the sole member of Agresti & Associates. Agresti notarized his own certification. The first SWTF agreement's schedule A of trust assets lists only cash totaling $18,750.

**[\*15]** The second SWTF agreement includes Molotsky's notary verification of the signatures of S. Wegbreit and Agresti dated October 20, 2003. This version also includes Agresti's certification on behalf of his firm as trustee dated March 11, 2003. Janis Palardy, Agresti's office manager, notarized this version of the certification. Palardy frequently backdated or notarized documents for Agresti that were dated incorrectly. The attached schedule A lists cash totaling $18,750 and an "Insurance with Policy Number: Acadia Life Ltd. BM0000136" as SWTF assets.

The third SWTF agreement states that the document was "restating the Samuel Wegbreit Trust Fund Agreement dated January 25, 2002" on both the cover page and in the first paragraph of the document. Both the third SWTF agreement and the first SWTF agreement include the same Illinois-commissioned notary's signature and stamp verifying the grantor's and the trustee's signatures. The third SWTF agreement and the first SWTF agreement include Agresti's notary verification of his sworn certification dated March 11, 2003. The attached schedule A lists cash totaling $18,750 as SWTF assets. Other than a blank "Exhibit A Notice of Contribution to Trust" form, no attachments or exhibits were included with the third SWTF agreement. The signatures and notary verifications

[*16] on the third SWTF agreement are photocopies of the ones on the first SWTF agreement.

    2.    <u>SWTF Agreements Substantive Provisions</u>

There are no material differences in the substantive provisions of the first, second, and third SWTF agreements (collectively SWTF agreements).  All three versions of the SWTF agreements list E. Wegbreit and petitioners Wegbreit's minor children as beneficiaries.  The SWTF agreements all include the following provisions:

Article II

Dispositive Provisions

The trustee shall administer and distribute the trusts created by this Agreement as follows:

    A. My Trustee may distribute to or for my spouse's benefit as much of the income and principal of the Trust as my Trustee, in its sole and absolute discretion, shall consider necessary or advisable for my spouse's education, health, maintenance, and support but shall not distribute in excess of five percent (5%) of the trust principal to all beneficiaries, annually.

My Trustee shall take into consideration, to the extent that my Trustee deems advisable, any income or resources of my spouse which are outside of the trust and are known to my Trustee.

    \*        \*        \*        \*        \*        \*        \*

**[*17]** Article IV

Trustee's Powers

The trustee shall have full power and authority to do any act or thing reasonably necessary or advisable for the proper administration and distribution of the trust created hereunder.  The powers hereinafter enumerated are in addition to and not in limitation of all other common law and statutory powers of trustees.  The powers hereby granted are as follows:

A. To retain any or all of the securities and properties transferred to or acquired by it hereunder, so long as it may deem such retention advisable or expedient, regardless of whether said securities and properties are of the kind and nature authorized by law for investment and without regard to any effect the retention may have upon the diversification of the trust estate.

B. To invest and reinvest the available funds of the trust estate in, or exchange trust assets for, such securities and properties as it deems advisable regardless of whether such securities and properties are of the kind and class authorized by law. * * * The Grantor cannot predict what investment options may be available to the trustee, given the long duration of the trusts created under this Agreement and, therefore, requests that the trustee's investment authority be broadly and liberally construed under the law then in effect applicable to fiduciary investment.

C. To retain cash funds uninvested for such reasonable periods of time as it shall determine; to deposit cash funds as a general deposit in a special account in the deposit department of any corporate trustee acting hereunder without liability for interest thereon.

D. To sell, grant options to buy, convey, transfer, assign, exchange, lease, mortgage, pledge or otherwise dispose of any or all of the properties of the trust estate, including real property, at such

**[*18]** prices, on such terms, to such persons, in such portions, and in such manner as it may in each case deem proper and advisable for the administration of the trust, and for terms extending beyond the administration of the trust herein created.

E. To vote all stocks and exercise all rights incident to the ownership of stocks, bonds or other securities or properties held in the trust estate * * * and to otherwise exercise any and all rights and powers and deal in and with the securities and properties in the same manner and to the same extent as any individual owner and holder thereof might do.

\*          \*          \*          \*          \*          \*

Article V

Accountings

The trustee shall render an annual written account of the administration of any trust created by this Agreement to the beneficiaries then eligible to receive income from the trust. * * *

\*          \*          \*          \*          \*          \*          \*

Article IX

Resignation and Succession of Trustees

A. Resignation.  The trustee of any trust created by this Agreement may resign by <u>giving written notice to the adult beneficiaries to whom income then could be distributed</u>.  Such resignation shall take effect on such date, not earlier than thirty (30) days after the date of delivery of the written resignation, as shall be specified in such instrument of resignation unless an earlier effective date shall be agreed to by the adult income beneficiaries.  Upon the effective date of such resignation, the trustee shall be relieved of any further duties and responsibilities regardless of whether a successor

[*19] trustee has then been appointed and shall not be liable or responsible for the act of any successor trustee

      B. Appointment of Successors.  If the trustee resigns or for any reason ceases to serve as trustee of any trust created by this Agreement, then the trustee may appoint a successor trustee <u>which shall be a bank or trust company having trust powers subject to state or federal banking supervision</u>.  In the event trustee fail [sic] to appoint a successor trustee within sixty (60) days of resignation, the adult beneficiaries to whom income then could be distributed by majority action in writing may appoint a successor trustee, <u>which shall be a bank or trust company having trust powers subject to state or federal banking supervision</u>.  If agreement of a majority of the beneficiaries cannot be obtained within sixty (60) days of the trustee's resignation, a successor trustee shall be appointed by the court having general jurisdiction of the trust.  In the event of Trustee death, inability or unwillingness to serve prior to the Grantor's death, the Grantor shall appoint a successor trustee.

\*      \*      \*      \*      \*      \*      \*

Article X

Limitations on Trustee's Powers

      Notwithstanding anything in this Agreement to the contrary, neither the trustee, the Grantor, nor any other contributor to a trust hereunder, shall have (i) a power to purchase, exchange, or otherwise deal with or dispose of the principal or income of a trust for less than adequate or full consideration in money or money's worth, (ii) <u>a power enabling the Grantor or any other contributor to borrow the income or principal of a trust, directly or indirectly, without adequate interest or security</u>, (iii) the power to expend income of a trust to pay premiums on life insurance on the life of the Grantor, any contributor to a trust hereunder, or the spouse of the Trustor or a contributor to the trust, or (iv) a power of administration in a nonfiduciary capacity. For purposes of this Article, the term "power of administration"

[*20] means any one or more of the following powers:  (i) a power to vote or direct the voting of any stock or other securities of a corporation in which the holdings of the trust and the Trustor are significant from the viewpoint of voting control, (ii) a power to control the investment of the trust estate, either by directing investments or reinvestments, or by vetoing proposed investments or reinvestments, to the extent that the trust estate consists of stocks or securities of corporations in which the holdings of the Trustor and the trust are significant from the viewpoint of voting control, or (iii) a power to reacquire or exchange any property of a trust by substituting other property of an equivalent value.

[Emphasis added.]

Other than the notary verification dates and the statement that the third SWTF agreement restated a purported 2002 SWTF agreement, there are no material differences among the documents.  Each of the three agreements was produced by a different source in response to an Internal Revenue Service (IRS) subpoena.  No copies of the purported 2002 SWTF agreement were produced.

3.    SWTF Trustees

S. Wegbreit appointed Agresti & Associates to serve as the initial SWTF trustee.  S. Wegbreit believed that Agresti was the initial trustee rather than Agresti's firm.  Agresti executed numerous documents listing himself as the SWTF trustee.  Agresti continued to represent that he was the SWTF trustee in 2006 when his license to practice law was suspended and his firm ceased operations.  He continued to execute documents as the SWTF trustee after his

[*21] resignation in 2008. S. Wegbreit knew about Agresti's suspension and his firm's closure, yet he continued to seek Agresti's advice throughout the years in issue.

On February 7, 2008, Agresti resigned on behalf of Agresti & Associates as the SWTF trustee and appointed Paul Lewandowski to serve as successor trustee. Lewandowski was a certified public accountant but not an officer or employee of a bank or trust company having trust powers subject to State or Federal banking supervision. He shared offices with, but was not employed by, Orchard Financial Group, LLC (Orchard Financial), which was a Colorado-based insurance broker that Nelson Todd (N. Todd) and Agresti owned.

The same day Lewandowski was appointed the SWTF trustee, he delegated part of his authority to Orchard Administrators, LLC (Orchard Administrators), and signed a trust administration agreement with Orchard Administrators. Orchard Administrators was a subsidiary of Orchard Financial established to maintain premium financed life insurance policies purchased by Orchard Financial's clients. The trust administration agreement limited Orchard Administrators' delegated authority to maintaining a premium financed life insurance policy purportedly owed by SWTF. On May 2, 2011, Lewandowski resigned as the SWTF trustee and appointed N. Todd as successor trustee.

[*22] N. Todd served as the SWTF trustee from May 2, 2011, through May 14, 2012. During his time as trustee N. Todd neither inquired nor was informed about the assets or entities purportedly held by SWTF. Upon N. Todd's resignation he appointed Lewandowski as successor trustee, and Lewandowski continued to serve as the SWTF trustee. At no time did any SWTF trustee independently identify assets for the trust to purchase or make investment decisions for the trust. All decisions were made by S. Wegbreit.

The Threshold Policy

Threshold, an insurance company based in the Cook Islands, purportedly issued the Threshold policy, a variable life insurance policy insuring the life of S. Wegbreit, in 2002. Two copies of the Threshold policy are in the record; both list the policy date as January 25, 2002, and both list the same policy number, 812-25058. One of these copies (first Threshold policy) includes a schedule which states that the initial specified first year premium amount is $13,220 and the initial specified face amount is $2.8 million. It also lists the Wegbreit Family Partnership (WFP) as the beneficiary. The other copy (second Threshold policy) includes a schedule which states that the initial specified first year premium amount is $236,356 and that the initial specified face amount is $4.7 million. The second Threshold policy schedule lists SWTF instead of the WFP as the beneficiary.

**[*23]** Neither Threshold policy was signed by an officer or agent of Threshold, nor were any illustrations calculating the value of the policy, premiums required, and death benefits prepared at the time the Threshold policy was purportedly issued.

The two Threshold policies include identical substantive provisions including the following:

I. Introduction

A. Carrier; Type of Policy.

* * * Threshold is issuing this Policy in consideration of the submission of the Underwriting Application and the payment of the Minimum First Premium by the Policy Owner.

\*  \*  \*  \*  \*  \*  \*

IV. Premium Payment.

A. Flexible Premiums.  Premium payments are flexible.  The Policy Owner can choose the amount and frequency of payments, subject to certain restrictions.  After the Minimum First Premium has been paid, subsequent premiums may be paid at any time, subject to the right of Threshold to reject any premium payment in its absolute discretion. The actual amount and frequency of premium payments will affect the Cash Value, Cash Surrender Value, duration of insurance and Death Benefit.

B. First Premium.  The amount of the Minimum First Premium is shown on the Policy Schedule.  There is no insurance until this premium is paid, and the Policy is issued and delivered by Threshold.

\*  \*  \*  \*  \*  \*  \*

**[*24]** V. Variable Sub-Account.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

B. The Variable Sub-Account

1. Sub-Custodian Accounts.  All Premiums received by Threshold \* \* \* plus all earnings credited to the Variable Sub-Account, will be held in the Variable Sub-Account established by Threshold with the Custodian. \* \* \*

2. Variable Sub-Account. \* \* \* <u>No Policy Owner has the right to require Threshold, or any Investment Advisers selected by the Policy Owner with the approval of Threshold, to acquire any particular investment with premiums paid to, or the earnings of, the assets in the Variable Sub-Account established by Threshold with the Custodian.</u>  The Policy Owner has no legal, equitable, direct, indirect, or other interest in any specific investment of the assets held in, or belonging to, the Variable Sub-Account. \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

C. Custodial Administration.  The agreement between Threshold and the Custodian will provide that no Policy Loan or surrender payment may be made without proof of the written direction of the Policy Owner given \* \* \* as the case may be, being furnished to the Custodian. \* \* \*
[Emphasis added.]

(The record contains no evidence that either S. Wegbreit or SWTF submitted an application to Threshold.)

[*25] The premium for the Threshold policy was purportedly paid by assigning S. Wegbreit's Oak Ridge, LLC interest to Threshold. A document signed by S. Wegbreit and Agresti purports to assign S. Wegbreit's Oak Ridge, LLC interest to SWTF. A second document purports to assign S. Wegbreit's Oak Ridge, LLC interest from SWTF to the Threshold policy and was signed by Agresti as the SWTF trustee and purportedly signed by Mike Bishop, who was listed as the Threshold policy administrator (second assignment document). Neither assignment document is dated or verified by a notary; however, both state that the assignment would be effective for all legal purposes as of January 25, 2002. Bishop had previously worked with Agresti at Cornerstone Strategic Advisers, LLC.

Bishop did not sign the second assignment document. He neither worked for Threshold nor served as a Threshold administrator at any material time. No steps were taken by Oak Ridge companies to transfer S. Wegbreit's Oak Ridge, LLC interest to Threshold or to add Threshold as a member in 2002. In 2002 Oak Ridge, LLC paid S. Wegbreit directly for distributions allocated to his membership interest.

**[*26]** Threshold Policy Investments

Agresti formed numerous entities purported to be assets held by Threshold for SWTF's benefit.  On or about February 16, 2004, Threshold issued a closing statement (Threshold closing statement) that listed assets and the Threshold policy's purported cash surrender value as follows:

| Description | Acquisition date | Acquisition value | Closing value |
|---|---|---|---|
| Cash or cash equivalents | Various | $32,240.40 | $58,159.90 |
| Extreme Beverage, LLC 2 Class A and .4 Class B | June 1, 2002 | 100,000.00 | 100,000.00 |
| Oak Ridge Investments, LLC | June 1, 2002 | 236,356.00 | 836,356.00 |
| Grand Prix Jumpers, LLC | June 1, 2002 | 160,000.00 | 275,000.00 |
| Blackdog Fund, LLC | Aug. 1, 2003 | 100,000.00 | 119,631.53 |
| Policy loans | --- | --- | (300,000.00) |
| Total account value | --- | --- | 1,389,147.43 |
| Cash surrender value | --- | --- | 1,089,147.43 |

The Threshold closing statement contains numerous errors and inaccuracies including:  the wrong policy issue date, inaccurate listing of SWTF's name, and incorrect asset acquisition dates.

**[*27]** <u>Acadia Policy</u>

On or about February 16, 2004, Acadia, an insurance company based in Bermuda, issued the Acadia policy, a variable life insurance policy, to SWTF. Acadia issued its policy as part of a purported section 1035 exchange for the first Threshold policy issued to the WFP rather than SWTF. Agresti executed a document styled as a 1035 Exchange Form Variable Life Insurance Letter of Assignment (1035 exchange form) dated February 16, 2004, which Donald Cameron, the Deputy Chairman of Acadia, had signed on or about February 15, 2004. Agresti listed the address and phone number for Agresti & Associates as Threshold's contact information. Agresti executed the 1035 exchange form as SWTF trustee and not on behalf of the WFP. The Acadia policy required an initial premium payment of $1,614,147.40 and had an initial face value of $5,960,574. The initial premium for the Acadia policy was paid by a purported transfer of the interests in entities identified in the Threshold closing statement and $283,159.90 in cash or cash equivalents.

On March 3, 2004, Palardy sent a certificate to S. Wegbreit by Federal Express with instructions to have the managing member of Oak Ridge, LLC sign and return the certificate by March 5, 2004. The certificate purported to transfer S. Wegbreit's Oak Ridge, LLC interest from Oak Ridge, LLC to Acadia for the

[*28] benefit of the Acadia policy. The certificate states that "[t]ransfer of these [u]nits is subject to restrictions [sic] in the [o]perating [a]greement for * * * [Oak Ridge Investments, LLC] and applicable laws." Klaskin signed the certificate, which Palardy had pre-dated as being executed on February 16, 2004; however, his signature was not verified by a notary or otherwise witnessed. Klaskin did not own S. Wegbreit's interest in Oak Ridge, LLC and did not have authority to transfer S. Wegbreit's Oak Ridge, LLC interest to Acadia. No steps were taken to admit Acadia as a member of Oak Ridge, LLC or to comply with the Oak Ridge, LLC operating agreement to transfer S. Wegbreit's Oak Ridge, LLC interest to any other entity.

Acadia prepared a policy illustration dated March 25, 2004 (first illustration), that stated year 1 investment income as $9,205,107 and the yearend value of the segregated account as $10,204,433. The first illustration further stated the first year annual premium was $1,089,147 and the face amount was $4,021,903. On or about April 13, 2004, Acadia prepared a second policy illustration (second illustration), that stated year 1 investment income as $13,868,871 and a yearend segregated account value of $15,372,488. The second illustration stated the first year annual premium was $1,614,147 and the face amount was $20 million. On or about April 14, 2004, Acadia prepared a third

[*29] policy illustration (third illustration), that stated year 1 investment income as $13,962,111 and a yearend segregated account value of $15,412,719. The third illustration stated the first-year annual premium was $1,614,147 and the face amount was $5,960,574. Each illustration indicated a 900% increase in the segregated account value over the initial investment amounts, which reflected the anticipated sale of S. Wegbreit's Oak Ridge, LLC interest to Pioneer.

On May 3, 2004, Agresti sent identical letters to Klaskin and Pioneer that claimed Acadia held title to S. Wegbreit's Oak Ridge, LLC interest in a segregated account for the benefit of SWTF. Agresti further stated that SWTF consented to Acadia's taking all necessary actions to sell S. Wegbreit's Oak Ridge, LLC interest. Palardy transferred the proceeds from the sale of S. Wegbreit's Oak Ridge, LLC interest to Acadia by June 2005 with instructions that Acadia credit the funds as investment dividends, not premium payments.

Threshold and Acadia Policy Segregated Account Assets

1. Executive Placement Qsub-102, Inc.

Agresti formed Executive Placement Qsub-102, Inc. (Executive Placement), as a Wyoming corporation on November 22, 2002 and named himself vice president. The record contains no further information regarding Executive Placement's ownership, purpose, or business activities. On May 28, 2005, the

[*30] Wyoming secretary of state administratively dissolved Executive Placement's incorporation for tax and annual reporting delinquency. (In his deposition, Agresti denied ever having been involved with, or knowing anything about, Executive Placement.)

S. Wegbreit caused Oak Ridge, LLC to report Executive Placement as the owner of his interest in Oak Ridge, LLC on Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., for 2002. For that year Oak Ridge, LLC reported distributions to Executive Placement of $825,000, which represented the entire allocation for S. Wegbreit's Oak Ridge, LLC interest in 2002. Oak Ridge, LLC's Schedules K-1 for 2003 reflect that S. Wegbreit's entire Oak Ridge, LLC interest was transferred from Executive Placement to the Threshold policy. Oak Ridge, LLC reported for 2003 that the company distributed all of the allocated profits for S. Wegbreit's Oak Ridge, LLC interest to Agresti on behalf of the Threshold policy. Oak Ridge, LLC paid a single distribution of $131,250 to the "Samuel Wegbreit--Policy" on February 28, 2003. The company paid the remaining 2003 distributions, totaling $506,250, to Executive Placement.

2. Blackdog Fund, LLC

In or about December 2002, Agresti formed Blackdog Fund, LLC (Blackdog Fund), in Nevada as a hedge fund. Agresti filed a Form D, Notice of

[*31] Sale of Securities Pursuant to Regulation D, Section 4(6), and/or Uniform Limited Offering Exemption, with the Securities and Exchange Commission on January 28, 2003, reporting that he was the member manager of Blackdog Fund. As of the date Agresti filed Form D, Blackdog Fund had no investors or licensed brokers, and he reported that the company incurred $15,000 in accounting fees.

On or about February 16, 2004, Agresti, as a purported asset allocator for Acadia, purchased an unknown percentage of the membership interest in Blackdog Fund for $119,631.53. He also approved the sale, which was below the $200,000 minimum subscription price, as the managing member of Blackdog Fund. On or about January 18, 2005, Agresti requested on behalf of SWTF that Acadia invest $1 million in Blackdog Fund, and he instructed that the funds be deposited into Agresti & Associates' client trust account. On January 25, 2007, Bradford Todd (B. Todd), N. Todd's son, notified Acadia by email that Blackdog Fund had ceased trading and closed as of December 31, 2006. The ending balance for Acadia's Blackdog Fund account was $865,215.12 after repaying $90,026.28 to Agresti. On March 9, 2007, Blackdog Fund deposited a total of $1,106,305.19 into Acadia's Bank of Bermuda account.

**[*32]** 3.     Grand Prix Jumpers, LLC

Agresti formed Grand Prix Jumpers, LLC (GPJ), as a Colorado limited liability company on July 22, 2003.  Executive Placement was GPJ's sole member.  Agresti, Threshold, and B. Todd held the first organizational meeting for GPJ on or about July 22, 2003, and selected B. Todd as the initial manager.  B. Todd served as GPJ's manager until January 1, 2006, when he was replaced by Palardy.  Neither B. Todd nor Palardy played a role in selecting investments made by GPJ.  On or about February 16, 2004, Agresti caused 100% of the membership interest in GPJ to be transferred to Acadia.  No representatives of Executive Placement participated in GPJ's activities or approved the company's investments or its transfer of membership interests.

GPJ purported to be in the business of training and showing horses.  On or about July 25, 2003, S. Wegbreit used $160,000 purportedly transferred from Threshold to GPJ to purchase a show horse named Tom Cruise.  He bought Tom Cruise from Connie Stevens.  Stevens was a horse trainer who had been the Wegbreit children's riding instructor since 2000.  She also trained two other horses petitioners Wegbreit owned for their children's use.  S. Wegbreit first stabled Tom Cruise with Stevens and later with trainers in Wisconsin and Maryland.  Stevens and the other trainers entered Tom Cruise in several

[*33] competitive horse shows in 2004 and 2005. Various equine service providers billed petitioners Wegbreit directly for expenses related to caring for, insuring, and showing Tom Cruise. S. Wegbreit forwarded the bills to Palardy to be paid by GPJ. On or about October 7, 2005, S. Wegbreit transferred Tom Cruise to the Fernleigh Foundation.

Petitioners Wegbreit used GPJ to disguise their purchase of three Florida condominiums. To conceal further petitioners Wegbreit's ownership interest in the condominiums, Agresti and Palardy formed three additional Colorado LLCs. These entities were named Grand Prix Toscana North, LLC (GP Toscana, LLC), Grand Prix Asset Management, LLC (GPAM, LLC), and Grand Prix Luxuria, LLC (GP Luxuria, LLC). Palardy opened separate bank accounts for GP Toscana, LLC; GPAM, LLC; and GP Luxuria, LLC (collectively condominium LLCs), which petitioners Wegbreit used to repatriate funds purportedly held in the Acadia policy.

On or about November 18, 2005, petitioners Wegbreit used GPJ to purchase the first condominium for $1,164,000. This condominium was located on South Ocean Boulevard in Boca Raton, Florida (Toscana North condominium). Petitioners Wegbreit obtained a $929,250 mortgage from Harris Bank to purchase the Toscana North condominium. They listed GPJ as the owner on the mortgage

[*34] documents and the deed. Harris Bank required SWTF and petitioners Wegbreit each to guarantee the mortgage as a condition of its approval. From 2005 until 2008 petitioners Wegbreit lived in the Toscana North condominium one to two months a year. From 2008 through 2010 the Toscana North condominium served as their primary residence. Petitioners Wegbreit never transferred title to the Toscana North condominium to GP Toscana, LLC. On September 19, 2013, petitioners Wegbreit sold the condominium for $867,500.

The second Florida condominium, on Collins Avenue in Sunny Isles Beach, Florida (Acqualina condominium), was still under construction at the time petitioners Wegbreit purchased it for $1,150,000. On or about April 21, 2006, petitioners Wegbreit obtained an $862,500 mortgage from Harris Bank. Harris Bank again required SWTF and petitioners Wegbreit to guarantee the mortgage. Harris Bank initially approved the mortgage in petitioners Wegbreit's names; then, at S. Wegbreit's request, the bank repapered the mortgage in the name of GPAM, LLC. S. Wegbreit signed a quitclaim deed dated July 23, 2003, conveying Acqualina condominium to GPJ. GPAM, LLC was listed as the owner on the deed. On or about November 2008, petitioners Wegbreit sold the Acqualina condominium for $1,350,000. The proceeds of $403,513 from the sale were deposited into GPAM, LLC's account.

[*35] On or about February 25, 2009, petitioners Wegbreit purchased the final Florida condominium on South Ocean Boulevard in Boca Raton, Florida (Luxuria condominium). They directed Palardy to obtain $445,000 from Acadia to pay the deposit on the $4,550,000 purchase price. Petitioners Wegbreit obtained a $3,412,500 mortgage from CitiMortgage to pay part of the purchase price. CitiMortgage did not require petitioners Wegbreit to guarantee the mortgage. Instead S. Wegbreit was a coborrower for the mortgage. As they did with their purchase of the first Florida condominium, petitioners Wegbreit listed an entity, GP Luxuria, LLC, as the condominium's owner on the mortgage documents and the deed. In or about April 2012 petitioners Wegbreit sold the Luxuria condominium for $2.5 million.

Agresti, Palardy, and petitioners Wegbreit represented to Acadia that each of the condominium LLCs owned one of the Florida condominiums and that all three entities were wholly owned by GPJ. By 2006 Palardy managed GPJ and all three condominium LLCs. S. Wegbreit instructed Palardy to direct Acadia to transfer funds into the GPJ and condominium LLC accounts to pay for purchase deposits and other expenses. No effort was made to keep the condominium LLCs' finances separated. Palardy routinely shifted funds to and from these accounts to pay for utilities, condominium fees, mortgages, and other expenses as they came

[*36] due.  Palardy did not conduct any due diligence to determine whether the payments were for personal or business expenses.  No effort was made to track or repay the funds shifted between GPJ and the condominium LLCs accounts.

Control of Acadia Policy Funds

In addition to the three Florida condominiums, S. Wegbreit used GPJ to channel funds from Acadia into numerous other investments.  S. Wegbreit repeatedly emailed Angela Rawcliffe, an Acadia employee assigned to the S. Wegbreit policy account, to request account statements.  He remained in frequent contact with Rawcliffe to question loan and credit amounts and to direct Acadia to distribute funds for particular investments or into specific accounts.  S. Wegbreit instructed Palardy to open an account for Acadia and GPJ at Smith Barney where Christopher Waltman managed the personal IRA accounts for petitioners Wegbreit.  The Smith Barney accounts gave S. Wegbreit direct access to the funds deposited there by Acadia and GPJ.

S. Wegbreit identified numerous funds and companies in which he wanted Acadia to invest the segregated accounts.  He instructed Acadia whether to make the investments directly or through GPJ, how much money Acadia should invest, and when to invest.  Acadia withdrew from several investments at S. Wegbreit's insistence.  He provided detailed instructions regarding how to do so and whom to

[*37] contact. S. Wegbreit actively involved himself in the management of Acadia and SWTF investments to the point that Waltman began contacting him directly about the accounts. This prompted Rawcliffe to warn S. Wegbreit on February 9, 2006, against creating a paper trail for the IRS and to instruct Waltman to contact her with questions going forward.

Acadia Policy Loans

E. Wegbreit was the only individual who could request distributions or loans from SWTF. S. Wegbreit prepared letters and forms for E. Wegbreit to request funds from SWTF. He also routinely asked E. Wegbreit to request that SWTF obtain funds from the Acadia policy for their shared personal expenses. S. Wegbreit explained the financial transactions involved with each document he asked E. Wegbreit to sign. E. Wegbreit read everything S. Wegbreit gave her to sign and asked questions whenever she did not understand a document or one of the transactions involved. E. Wegbreit never refused his requests that she obtain funds from SWTF. E. Wegbreit also knew that their family expenses did not decrease after S. Wegbreit sold his interest in Oak Ridge, LLC and that he did not earn as much income after that sale. She was also involved in the selection of the Florida condominiums purportedly purchased by GPJ and the condominium LLCs.

[*38] Petitioners Wegbreit began withdrawing loans from the Acadia policy as soon as it was issued in 2004. While E. Wegbreit did not make any written requests for funds from SWTF in 2004, Agresti regularly submitted loan request forms to Acadia. In 2004 Acadia sent purported loans of $485,000 to petitioners Wegbreit. They received funds from Acadia totaling $891,000 in 2005, $850,000 in 2006, $750,000 in 2007, and $672,000 in 2008, funded through the assets held by Acadia. Petitioners Wegbreit used the funds to pay their personal expenses including phone bills, utility service for their houses, insurance, property taxes, and condominium association fees. Beginning with 2005, petitioners Wegbreit reported for tax purposes income that was not sufficient to support their family's lifestyle.

Petitioners Wegbreit did not have a joint bank account during the years to issue. The purported policy loans were deposited to accounts on which E. Wegbreit did not have signature authority and which S. Wegbreit controlled directly or indirectly. Acadia ignored the fact that the purported loans directly benefited S. Wegbreit by depositing the funds into his accounts. E. Wegbreit neither repaid nor believed she would be required to repay the loans to SWTF. She did not keep copies of the loans requested from SWTF or related documents, and she did not know the total amount she allegedly owed to SWTF. SWTF did

[*39] not track the purported loans to petitioners Wegbreit or the interest charged. No demands for repayment were made by Acadia or SWTF.

IRA Conversion

At some point during 2007 S. Wegbreit attempted to convert funds from both his and E. Wegbreit's traditional IRA to a Roth IRA. He withdrew $57,236 from E. Wegbreit's traditional IRA and $1,017,379 from his own. Revenue Agent Siebert, who was conducting an examination of petitioners Wegbreit, warned them by letter dated August 28, 2008, that they must elect to recharacterize these amounts as contributions to a traditional IRA by the time they filed their returns for the 2007 year. Despite this warning petitioners Wegbreit did not timely elect to recharacterize their attempted IRA conversion. Instead they attempted to lower their taxable income below the modified adjusted gross income threshold for qualified rollover Roth IRA contributions.

On or about October 1, 2006, petitioners Wegbreit made an investment through the Wegbreit 2006 Sub-Trust (WST) in the Sugarloaf Investment Fund (Sugarloaf). Sugarloaf contributed Brazilian receivables to the WST as part of a distressed asset trust transaction (DAT transaction). Petitioners Wegbreit claimed losses generated by the DAT transaction on their return for the 2007 year. Their deductions of losses in the DAT transaction were not allowable, and the parties

**[*40]** have stipulated that they would be bound by this Court's final judgment in

Kenna Trading, LLC v. Commissioner, 143 T.C. 322 (2014), aff'd, 911 F.3d 854

(7th Cir. 2018).

Tax Reporting for 2005 Through 2009

Petitioners Wegbreit prepared and jointly filed their Forms 1040, U.S.

Individual Income Tax Return, for 2005 through 2009.  They reported little

taxable income for the years in issue as follows:

| Year | Reported U.S. taxable income |
|------|------------------------------|
| 2005 | $32,663 |
| 2006 | 6,144 |
| 2007 | -0- |
| 2008 | -0- |
| 2009 | -0- |

Petitioners Wegbreit did not report any of the funds they received from Acadia

from 2005 through 2008.  Neither did they report any profits derived or losses

incurred by any of the entities purportedly owned by Acadia or SWTF for the

years in issue.  E. Wegbreit reviewed and signed all returns before they were filed

for each of the years in issue.  She knew that they reported very little taxable

income for 2005 and 2006 and substantial losses for 2007 through 2009.

**[*41]** For year 2006 petitioners Wegbreit reported a nonpassive loss of $798 related to their DAT transaction on their Schedule E, Supplemental Income and Loss. They did not file a Form 8886, Reportable Transaction Disclosure Statement, with their 2006 return for their DAT transaction. Instead they waited to submit a Form 8886 until they filed their return for 2007. For that year they reported DAT transaction-related nonpassive losses of $1,695,415 on their Schedule E. They also reported converting a total of $1,074,615 from their traditional IRA to a Roth IRA on Form 8606, Nondeductible IRAs, for 2007. For 2008 they reported a Net Operating Loss (NOL) carryforward of $602,994, and they included a Form 8886 disclosing their DAT transaction. They reported a gain of $9,958 received from Sugarloaf on their Form 8582, Passive Activity Loss Limitations, for 2009.

In the absence of DAT transaction-related deductions claimed by petitioners Wegbreit for 2007, their modified adjusted gross income exceeded the $100,000 threshold for Roth IRA contributions. They did not file Form 5329, Additional Taxes on Qualified Plans (Including IRAs) and Other Tax-Favored Accounts, for 2007 through 2009. Respondent did not prepare a substitute Form 5329 for those years. Petitioners Wegbreit further failed to pay excise tax due on their excess Roth IRA contributions under section 4973 for 2007 through 2009.

[*42] SWTF did not file returns for any of the years in issue. Respondent prepared section 6020(b) substitutes for returns for SWTF for 2005 through 2009.

Respondent's Determinations

Beginning in 2008 the IRS conducted an examination of petitioners Wegbreit's returns for 2005 through 2009. As a result, on December 27, 2012, respondent issued to petitioners Wegbreit a notice of deficiency. Respondent determined that SWTF was the true owner of the assets allocated to the Acadia policy. Respondent further determined that SWTF was a grantor trust and that its income was taxable to petitioners Wegbreit. Pursuant to this theory, respondent determined that petitioners Wegbreit should recognize additional income of $10,599,558, $173,303, $2,199,364, $664,023, and $159,960 for 2005 through 2009, respectively. Respondent denied petitioners Wegbreit's claimed Schedule E loss deductions of $1,695,415 for year 2007 and the corresponding NOL of $602,944 for year 2008. Respondent also determined that, with respect to either position, petitioners Wegbreit are liable for section 6662 and 6662A accuracy-related penalties.

Because these adjustments increased petitioners Wegbreit's modified adjusted gross income over the $100,000 threshold, respondent determined they were not eligible to make a rollover conversion from a traditional IRA to a Roth

**[\*43]** IRA. Respondent adjusted petitioners Wegbreit's tax liability by $107,461.50 for the premature distribution from their traditional IRAs in year 2007. Respondent determined that petitioners Wegbreit were subject to a 6% excise tax on their excess contribution to a Roth IRA under section 4973 for 2007 through 2009. Because petitioners Wegbreit did not file Forms 5329 for 2007 through 2009, respondent determined that they were liable for section 6651(a)(1) additions to tax for failure to file a return timely, and section 6651(a)(2) additions to tax for failure to pay tax shown on the return timely.

Respondent sent SWTF a notice of deficiency on April 4, 2013. The notice of deficiency takes a "whipsaw" position with respect to the proceeds from the sale of S. Wegbreit's Oak Ridge, LLC interest, the income derived from the assets purportedly held by Acadia, and the inclusion of all the income as attributable to petitioners Wegbreit. Respondent acknowledges that SWTF must be found to be a complex trust in order for the Court to reach these issues. Respondent also determined that, with respect to either position, petitioners Wegbreit are liable for section 6662 and 6662A accuracy-related penalties, section 6651(a)(1) additions to tax for failure to file a return timely, and section 6651(a)(2) additions to tax for failure to pay tax shown on the return timely.

**[*44]** After the petition and the answer were filed, respondent conducted discovery, including depositions of Agresti, Palardy, N. Todd, and an Acadia representative, during which the inconsistent and backdated documents described above were produced. Respondent moved to amend the answer alleging new theories and asserting additions to tax for fraud under section 6663. The motion was granted. The amended answer alleged that: (1) neither the Threshold policy nor the Acadia policy was a valid insurance policy; (2) petitioners Wegbreit knowingly misstated facts concerning the assets allegedly held in the policy; (3) petitioners Wegbreit set up a tax scheme involving Acadia to avoid tax on S. Wegbreit's sale of his interest in Oak Ridge, LLC; (4) petitioners Wegbreit schemed to omit income from assets held with Acadia by purported loans from SWTF, sheltering large amounts of income for each year while paying minimal or no income tax; (5) petitioners Wegbreit created false and misleading documents relating to a series of sham transactions for the sole purpose of concealing their income and misleading the IRS in an attempt to evade tax they knew to be due and owing on the income for 2005 through 2009; (6) petitioners Wegbreit willfully failed to report distributions from Oak Ridge, LLC; and (7) E. Wegbreit failed to report taxable distributions when she attempted to reclaim the moneys petitioners

[*45] funneled offshore, including amounts disguised as loans equal to $891,000 in 2005, $850,000 in 2006, $750,000 in 2007, and $672,000 in 2008.

ULTIMATE FINDINGS OF FACT

S. Wegbreit owned his interest in Oak Ridge, LLC at all relevant times. S. Wegbreit never transferred his Oak Ridge, LLC interest to SWTF, and the proceeds from the sale of his interest to Pioneer were includable in petitioners Wegbreit's income for 2005.

SWTF was formed on March 11, 2003. SWTF is a sham and disregarded for Federal tax purpose. Petitioners Wegbreit are therefore liable for Federal income tax on SWTF's income for each of the years in issue.

The Threshold policy is not a valid life insurance policy and was not eligible for nonrecognition treatment as part of an exchange for another insurance policy under section 1035.

The Acadia policy is not a valid life insurance policy, and distributions to petitioners Wegbreit were not valid loans.

Petitioners Wegbreit withdrew $57,236 from E. Wegbreit's traditional IRA and $1,017,379 from S. Wegbreit's traditional IRA in 2007. Their modified adjusted gross income exceeded the $100,000 threshold for Roth IRA contributions for 2007 through 2009.

[*46] Petitioners Wegbreit did not file Forms 5329 for 2007 through 2009. Respondent did not prepare substitute Forms 5329 for those years.

Petitioners Wegbreit failed to pay excise tax due on their excess Roth IRA contributions under section 4973 for 2007 through 2009.

Petitioners Wegbreit created false and misleading documents relating to a series of sham transactions for the sole purpose of concealing their income and misleading the IRS in an attempt to evade tax they knew to be due and owing on the income for 2005 through 2009.

OPINION

Respondent contends that: (1) petitioners Wegbreit had unreported income for 2005 through 2009; (2) SWTF is a sham and the assets held by SWTF are the assets of petitioners Wegbreit for which they were required to take into account the income, deductions, and credits of SWTF in computing their taxable income for 2005 though 2009; (3) S. Wegbreit did not transfer his interest in Oak Ridge, LLC to SWTF; (4) the gain realized on the sale of S. Wegbreit's Oak Ridge, LLC interest to Pioneer was includable in petitioners Wegbreit's gross income for 2005; (5) the purported exchange of the Threshold policy for the Acadia policy did not qualify for nonrecognition treatment under section 1035; (6) petitioners Wegbreit are liable for excise tax on excess IRA contributions under section 4973(a) and

[*47] additions to tax under section 6651(a)(1) and (2) for 2007 through 2009; and (7) petitioners Wegbreit are both liable for fraud penalties under section 6663 for 2005 through 2009, or in the alternative, for accuracy-related penalties under section 6662(a).

In general, taxpayers bear the burden of proving that the Commissioner's determination is erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). In an unreported income case, if the Commissioner introduces evidence that the taxpayer received unreported income, the taxpayer must show by a preponderance of the evidence that the deficiency determination was arbitrary and erroneous. Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), aff'g T.C. Memo. 1997-97; see also Pittman v. Commissioner, 100 F.3d 1308, 1313 (7th Cir. 1996), aff'g T.C. Memo. 1995-243.

In order to shift the burden of proof under section 7491(a), taxpayers must, among other things, introduce credible evidence as to any factual issue and must have maintained required records. Sec. 7491(a)(1) and (2). Neither petitioners Wegbreit nor SWTF have done so.

The Commissioner has the burden of proving by clear and convincing evidence that (1) an underpayment exists for the year in issue and (2) some portion of the underpayment is due to fraud. See sec. 7454(a); Rule 142(b). The

**[*48]** Commissioner also has the burden of producing evidence in relation to other penalties. Sec. 7491(c). Thus in analyzing the evidence in this case we have considered whether it is clear and convincing as to the elements of underpayment of tax for each year and of fraudulent intent. We conclude that the evidence is sufficient under that standard.

Many of the critical documents in the record reflect "effective as of" dating and do not reveal when they were executed. Most of the documents were also prepared or notarized by Palardy. Palardy admitted that at Agresti's request she would backdate documents and notarize documents stating incorrect dates. That any backdating occurred suggests a willingness to manipulate the relevant chronology in a way that undermines the credibility of petitioners Wegbreit's evidence.

The "effective as of" dating and the backdating of relevant documents also impede our review of the substance of the transactions involving SWTF, Threshold, and Acadia and lead us to conclude that the chronology reflected in those documents is not credible. The number of documents in the record that are on their face unreliable has made this case considerably more difficult. Our chore is compounded because the parties included numerous duplicate copies of key documents without explanation or analysis. Notwithstanding the Court's

[*49] comments and directions at the conclusion of the trial, the briefs of the parties failed to focus on the material facts. Respondent's proposed findings of fact merely summarize testimony and documents and generally fail to analyze the transactions and entities involved. See Rule 151(e). Respondent continues to use the shotgun approach to theories of the case rather than selecting the strongest arguments and focusing on them. Petitioners Wegbreit's briefs misstate the record and are unreliable. After dealing directly with the record with little aid from the parties' briefs, we conclude that the reliable evidence is clear and convincing as to unreported income and fraudulent intent.

I.      Unreported Income

Gross income generally includes all income from whatever source derived. Sec. 61(a). Taxpayers must keep adequate books and records from which their correct tax liability can be determined. Sec. 6001. When a taxpayer fails to keep records, the Commissioner has discretion to reconstruct the taxpayer's income by any reasonable means. Sec. 446(b); Webb v. Commissioner, 394 F.2d 366, 371-372 (5th Cir. 1968), aff'g T.C. Memo. 1966-81; Factor v. Commissioner, 281 F.2d 100, 117 (9th Cir. 1960), aff'g T.C. Memo. 1958-94. The IRS used the bank deposits method to reconstruct the amounts of distributions petitioners Wegbreit received from SWTF, Acadia, GPJ, and the condominium LLCs. The record

**[\*50]** contains banking records showing that petitioners Wegbreit regularly received distributions from SWTF and Acadia.

Petitioners Wegbreit, SWTF, and the various related entities failed to maintain adequate books and records. Those documents and records that are in the record reveal a lack of competent draftsmanship and inattention to detail. Several assignment and transfer documents in the record appear to convey property and assets to the wrong entity, entities that had not been formed yet, and entities of whose existence there is no evidence. Numerous email communications from petitioners Wegbreit show that S. Wegbreit directed both SWTF and Acadia to deposit funds into the GPJ account which were then used to purchase the Florida condominiums, among other investments, and to pay for petitioner Wegbreit's personal expenses.

Petitioners Wegbreit have provided no credible evidence demonstrating error in respondent's bank deposits analysis, and they do not dispute the amounts of funds received for any of the years in issue. Instead they argue that these funds consisted of loans by the Acadia policy and distributed by SWTF to E. Wegbreit as its beneficiary. Petitioners Wegbreit argue that the purported loans are not includable in income.

**[*51]** Respondent has introduced evidence reflecting that SWTF and its related entities received numerous disbursements from Acadia, which petitioners Wegbreit used for their personal expenses. Respondent has provided clear and convincing evidence that petitioners Wegbreit had unreported income for each of the years in issue. Petitioners Wegbreit have the burden of proving that not all of that income is taxable to them. See United States v. Shavin, 320 F.2d 308, 310-311 (7th Cir. 1963); Brooks v. Commissioner, 82 T.C. 413, 432-433 (1984), aff'd, 772 F.2d 910 (9th Cir. 1985).

## II. SWTF Disregarded as a Sham

Respondent argues that SWTF should be disregarded as a separate entity for Federal tax purposes on the basis of three alternative arguments: (1) SWTF is a sham, (2) it is a grantor trust and its income is attributed to S. Wegbreit as the grantor, and (3) it is a trust subject to tax under sections 641 through 644 and therefore required to file Federal income tax returns for 2005 through 2009. Respondent further argues that all of SWTF's purported income and deductions for 2005 through 2009 should be attributable to petitioners Wegbreit as the true owners of the assets and accounts. Petitioners Wegbreit disagree and argue that SWTF was a valid trust.

[*52] In deciding whether to disregard a trust for Federal tax purposes, we consider four factors relating to the trust to determine whether the trust lacks economic substance: (1) whether the taxpayer's relationship to the property transferred to the trust materially changed after the trust's creation; (2) whether the trust has an independent trustee; (3) whether an economic interest passed to other trust beneficiaries; and (4) whether the taxpayer feels bound by the restrictions imposed by the trust agreement or the law of trusts. Markosian v. Commissioner, 73 T.C. 1235, 1243-1244 (1980). Whether a trust lacks economic substance is a question of fact. Paulson v. Commissioner, T.C. Memo. 1991-508, 1991 Tax Ct. Memo LEXIS 557, at *16, aff'd, 992 F.2d 789 (8th Cir. 1993). If a trust lacks economic substance apart from tax considerations, the trust is a sham and is not recognized for Federal tax purposes. See Zmuda v. Commissioner, 79 T.C. 714, 720-722 (1982), aff'd, 731 F.2d 1417 (9th Cir. 1984); Markosian v. Commissioner, 73 T.C. at 1241; Muhich v. Commissioner, T.C. Memo. 1999-192, slip op. at 14, aff'd, 238 F.3d 860 (7th Cir. 2001). Consideration of each of these four factors supports a conclusion that SWTF lacks economic substance and is a sham.

**[*53]** A.    <u>Taxpayer's Relationship to Trust Property</u>

There are three versions of SWTF's formation agreement in the record, and S. Wegbreit was unable to identify which of the three versions was the correct one. The record contains no evidence SWTF was formed earlier than March 11, 2003, or that any earlier entities such as a purported family partnership ever existed. Neither Agresti nor S. Wegbreit could explain the conflicting dates. There is no evidence that petitioners Wegbreit ever paid the $18,750 initial cash funding contribution to SWTF at its inception. The evidence clearly and convincingly shows that petitioners Wegbreit dominated SWTF and that the transfer of property into SWTF did not alter any recognizable economic relationship between petitioners and the transferred property. <u>See</u> <u>Markosian v. Commissioner</u>, 73 T.C. at 1241. Money was frequently deposited into or withdrawn from SWTF's accounts and the accounts of entities purportedly held by either SWTF or Acadia as investments at petitioners Wegbreit's direction. Petitioners Wegbreit's actions indicate that they believed they were free to do as they pleased with that money.

B.    <u>Independence of the Trustee</u>

The evidence is clear and convincing that none of the trustees were independent of petitioners Wegbreit. None of Agresti's successor trustees were banks or trust companies as required by the trust document. Agresti even

[*54] continued to represent that he was the trustee after he resigned. Significantly, none of the trustees refused or even questioned petitioners Wegbreit's requests for funds or participated in the identification, evaluation, or selection of the trust assets and investments.

C.      Economic Interests of Beneficiaries

The only beneficiaries of SWTF were E. Wegbreit and the two Wegbreit children. The evidence establishes that S. Wegbreit treated SWTF's assets and accounts as his own. Purported loans requested by E. Wegbreit were made at S. Wegbreit's urging and were deposited into accounts held in only S. Wegbreit's name. S. Wegbreit also exclusively directed how SWTF invested its assets. No economic interests flowed from the trusts to anyone other than S. Wegbreit and his immediate family.

D.      Respect for the Trust's Restrictions

Petitioners Wegbreit had unrestricted access to SWTF property, which indicates that they were not restrained by trust restrictions. They used GPJ and the condominium LLCs purportedly owned by Acadia for SWTF's benefit to pay their personal bills, lived in one of the Florida condominiums, and exercised complete control over how the funds in the accounts were spent.

**[\*55]** Petitioners Wegbreit argue that the funds received from SWTF and the Acadia policy were loans.  While they have produced two written loan agreements, there is no evidence that the terms of those loans were enforced or that petitioners Wegbreit made any payments.  The evidence precludes any conclusion that the loans were bona fide.

As the Court of Appeals for the Seventh Circuit has previously explained:

The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along.  The Commissioner and the courts are empowered, and in fact duty-bound, to look beyond the contrived forms of transactions to their economic substance and to apply the tax laws accordingly.  That is what we have done in this case and that is what taxpayers should expect in the future.

Saviano v. Commissioner, 765 F.2d 643, 654 (7th Cir. 1985), aff'g 80 T.C. 955 (1983).  We conclude that SWTF lacks any semblance of economic substance and was a mere alter ego of petitioners Wegbreit.  Accordingly, it should be disregarded for Federal income tax purposes.  See Sparkman v. Commissioner, 509 F.3d 1149, 1156 n.6 (9th Cir. 2007), aff'g T.C. Memo. 2005-136.  Petitioners Wegbreit are therefore liable for Federal income tax on the gains related to the sale of S. Wegbreit's Oak Ridge, LLC interest to Pioneer and on SWTF's income for each of the years in issue.  See Zmuda v. Commissioner, 79 T.C. at 722 ("In

[*56] substance, petitioners remained the owners of the property purportedly transferred * * * and accordingly are taxable on the income derived therefrom.").

III.    Invalidity of the Threshold and Arcadia Section 1035 Exchange

Section 1035 permits an exchange of one life insurance policy for another to receive nonrecognition treatment for Federal income tax purposes. See sec. 1035(a)(1). As an initial matter, a valid section 1035 exchange of life insurance policies requires that there be two valid policies in existence at the time of the exchange. Id. Respondent argues that the purported Threshold policy was a sham and that the section 1035 exchange of the Threshold policy for the Acadia policy was invalid. Petitioners Wegbreit disagree and claim that the policy premium was paid by assigning S. Wegbreit's Oak Ridge, LLC interest to Threshold.

A.    Threshold Policy

Petitioners Wegbreit provided two copies of Threshold policies with differing premiums and death benefit amounts. One of these copies lists the owner as the WFP. Neither copy was signed by an officer or agent of Threshold. Neither policy includes illustrations of policy value, required premiums, or death benefits over time. Petitioners Wegbreit provided no explanation as to why there are two policies or which one was the correct policy actually in force at the time of the purported exchange. No officer or agent of Threshold testified at trial, and there is

**[*57]** no evidence in the record that Threshold itself existed. Similarly, the record contains no evidence that the WFP ever existed.

The express terms of both copies of the Threshold policy require the premium to be paid in order for the policy to be issued. Petitioners Wegbreit argue that two documents dated January 25, 2002, purportedly assigning S. Wegbreit's Oak Ridge, LLC interest to SWTF and then from SWTF to Threshold establish that they paid the policy premium. Michael Bishop, whose name appears on the second assignment document as accepting S. Wegbreit's Oak Ridge, LLC interest assignment on behalf of Threshold, denies that he signed the document. He further denied in a sworn declaration that he ever worked for or was associated with Threshold. The second assignment document is unreliable and carries no evidentiary weight.

Oak Ridge, LLC never added Threshold as a member. The evidence establishes that Oak Ridge, LLC paid all of the membership distributions allocated to S. Wegbreit's Oak Ridge, LLC interest directly to S. Wegbreit in 2002. Only one such distribution made to Threshold in February 2003 was recorded in Oak Ridge, LLC's ledger. While Oak Ridge, LLC also reported that Threshold owned S. Wegbreit's Oak Ridge, LLC interest on its Schedule K-1 for year 2003, this representation is unpersuasive. In his roles as chief financial officer and chief

[*58] operating officer at the Oak Ridge companies, S. Wegbreit had complete control over what the company reported on its Federal tax filings and how transactions were recorded in the company books and records. We conclude that S. Wegbreit never transferred his interest in Oak Ridge, LLC to SWTF, to Threshold, or otherwise. The record compels the conclusion that the Threshold policy was never a valid life insurance policy and therefore could not have been exchanged for the Acadia policy as part of a section 1035 exchange.

B.    Acadia Policy

We now turn to the validity of the Acadia policy. The parties have stipulated that the Acadia policy premium was paid by exchanging the Threshold policy and its purported policy assets. There is no evidence in the record other than petitioners Wegbreit's unreliable testimony that the assets and investments, as listed in the Threshold closing statement, were ever owned by or assigned to Threshold. The purported transfer of these assets to Acadia could not have occurred. The evidence shows that only $506,250, which comprised the Oak Ridge, LLC distributions paid in 2003 to entities managed by Agresti, was available to transfer to Acadia. This amount falls far short of the $1,614,147.40 initial premium required by the Acadia policy. We conclude that the Acadia policy was not a valid life insurance policy.

[*59] Petitioners Wegbreit used Acadia to disguise their assets and income during all of the years in issue. When they repatriated funds they incorrectly characterized them as policy loans in an effort to avoid including them in their taxable income. Because we hold that the Acadia policy was not a valid life insurance policy the funds received were not policy loans and are includable in petitioners Wegbreit's taxable income.

IV.    Penalties and Additions to Tax

    A.    Section 6663(a) Fraud Penalty

As a threshold matter, respondent's burden of production under section 7491(c) includes establishing compliance with the supervisory approval requirements of section 6751(b). See Graev v. Commissioner, 149 T.C. 485 (2017), supplementing and overruling in part 147 T.C. 460 (2016). Respondent must show there was written supervisory approval of the initial penalty determination. The parties have stipulated that such supervisory approval was received before the section 6663 fraud penalty was imposed.

Section 6663(a) provides for a 75% penalty for any portion of an underpayment attributable to fraud. Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. Petzoldt v. Commissioner, 92 T.C. 661, 698 (1989). Fraudulent intent is defined as "actual, intentional wrongdoing,

**[\*60]** and the intent required is the specific purpose to evade a tax believed to be owing." Estate of Temple v. Commissioner, 67 T.C. 143, 159 (1976) (quoting Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), rev'g 40 B.T.A. 424 (1939)). If the Commissioner establishes that any portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud unless the taxpayer establishes by a preponderance of the evidence that part of the underpayment is not due to fraud. Sec. 6663(b). For the reasons discussed above, respondent has established by clear and convincing evidence that petitioners Wegbreit had unreported income and consequently an underpayment of tax for each year. The remaining question is whether petitioners Wegbreit each had fraudulent intent.

Fraud is never imputed or presumed but must be established by independent evidence that establishes fraudulent intent. Petzoldt v. Commissioner, 92 T.C. at 699. Fraud need not be established by direct evidence, which is rarely available, but may be proved by surveying the taxpayer's entire course of conduct and drawing reasonable inferences therefrom. Kosinski v. Commissioner, 541 F.3d 671, 679 (6th Cir. 2008), aff'g T.C. Memo. 2007-173; see Spies v. United States, 317 U.S. 492, 499 (1943). Courts have developed several "badges of fraud" from which fraudulent intent may be inferred including: (1) understatement of income;

**[\*61]** (2) failure to cooperate with tax authorities; (3) filing false documents; (4) intent to mislead which may be inferred from a pattern of conduct; (5) giving implausible explanations of behavior; and (6) maintaining inadequate records. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Camien v. Commissioner, 420 F.2d 283, 287 (8th Cir. 1970), aff'g T.C. Memo. 1968-12.

The evidence is clear and convincing that petitioners Wegbreit: (1) significantly understated their income; (2) failed to cooperate with tax authorities by providing evasive and misleading responses to interrogatories and during an investigative interview; (3) conspired with Agresti to produce falsified and back-dated documents to conceal assets and income and to mislead the Government; and (4) filed false Form 1040 for each year 2005 through 2009. S. Wegbreit further caused false and misleading information regarding the ownership of his Oak Ridge, LLC interest to be included with Oak Ridge, LLC's Forms 1065 and Schedules K-1 for 2002 through 2005.

Both petitioners Wegbreit gave testimony during trial that was implausible and unreliable. S. Wegbreit claimed that the WFP had existed in 2002 when he applied for the Threshold policy. He testified that Agresti and the other trustees selected SWTF investments, that he merely suggested investments to the trustees,

[*62] and that he was generally unaware how SWTF assets were invested. E. Wegbreit testified that she left family finances to her husband. She repeatedly testified that she either was unaware of or did not remember the various SWTF transactions. She testified inconsistently that she read every purported loan request, promissory note, and tax return she signed. She further testified that she would always ask about documents or transactions she did not understand, and that S. Wegbreit would answer her questions. Petitioners Wegbreit each engaged in a pattern of conduct by which they attempted to defraud the Federal Government.

Petitioners Wegbreit offered numerous documents that were back dated and otherwise unreliable on their face. They have presented no credible evidence to show that any part of the underpayment is not due to fraud. Accordingly, we hold that petitioners Wegbreit are liable for the section 6663(a) fraud penalty on the underpayment of tax required to be shown on their joint Form 1040 for each year 2005 through 2009. Because of our holding we need not address respondent's penalty determination under section 6662(a) and (b)(2) for those years. See sec. 6662(b).

**[\*63]** B.     Section 6651(a)(1) and (2) Additions to Tax

To meet the burden of production under section 7491(c), respondent must produce sufficient evidence that it is appropriate to impose the section 6651(a) additions to tax. See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). Petitioners must then produce evidence of reasonable cause or lack of willful neglect. Id.

In the case of a failure to file timely any return required under section 6011(a), section 6651(a)(1) imposes an addition of 5% of the tax required to be shown on the return for each month or fraction thereof for which there is a failure to file, not to exceed 25% in the aggregate. Taxpayers are required to file a Form 5329 for each year they have excess contributions to their IRAs. See Frick v. Commissioner, T.C. Memo. 1989-86, 1989 Tax Ct. Memo LEXIS 75, at \*20-\*21, aff'd without published opinion, 916 F.2d 715 (7th Cir. 1990); sec. 301.6058-1(d)(2) and (3), Proced. & Admin. Regs. Form 5329 is a tax return within the meaning of section 6011, and failure to file it can result in the section 6651(a)(1) addition to tax. See Frick v. Commissioner, 1989 Tax Ct. Memo LEXIS 75, at \*20-\*21. The addition to tax does not apply if the failure to file timely is due to reasonable cause and not due to willful neglect. Petitioners Wegbreit had excess contributions in the amounts set forth in our findings, and

**[*64]** they did not file the Forms 5329 for 2007 through 2009. Respondent therefore has met the burden of production. Petitioners Wegbreit have not argued that their failure to file Form 5329 was due to reasonable cause, and nothing in the record supports such a contention. Petitioners Wegbreit are liable for additions to tax under section 6651(a)(1) for 2007 through 2009.

Section 6651(a)(2) imposes an addition to tax on taxpayers for their failure to pay timely the amount of tax shown on a return. This addition to tax applies only when an amount of tax is shown on a return. See Wheeler v. Commissioner, 127 T.C. 200, 208-209 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008); Repetto v. Commissioner, T.C. Memo. 2012-168, slip op. at 38. A substitute for return prepared by the Commissioner under section 6020(b) is treated as a return filed by the taxpayer for purposes of section 6651(a)(2). Sec. 6651(g)(2). Where the taxpayer did not file a valid return, as is the case here, the Commissioner must introduce evidence that a substitute for return under section 6020(b) was prepared to satisfy the burden of production. Id. Petitioners Wegbreit failed to file Form 5329. Respondent has not introduced evidence that the IRS prepared substitutes for returns that meet the requirements of section 6020(b) for 2007 through 2009. Respondent has not met the burden of production, and the additions to tax under section 6651(a)(2) for those years are not sustained.

**[\*65]** We have considered all of the parties' arguments, and, to the extent not addressed above, we conclude that they are moot, irrelevant, or without merit. To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.